STATE of Wisconsin, Plaintiff-Respondent,†

v.

Raul RUIZ, Defendant-Appellant.
[Case No. 82–168–CR.]

STATE of Wisconsin, Plaintiff-Respondent,

v.

Antonio SERVANTEZ, Jr., Defendant-Appellant.
[Case No. 82–1120–CR.]

Court of Appeals

*Nos. 82–168–CR, 82–1120–CR. Submitted on briefs March 16, 1983.
—Decided May 25, 1983.*
(Also reported in 335 N.W.2d 892.)

† Petition to review granted.

For the defendant-appellant Ruiz the cause was submitted on the brief of *Martin I. Hanson* of *Hanson & Gasiorkiewicz* of Racine.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *James H. McDermott,* assistant attorney general.

For the defendant-appellant Servantez the cause was submitted on the brief of *Louis B. Butler, Jr.,* assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *James H. McDermott,* assistant attorney general.

Before Scott, C.J., Voss, P.J., and Brown, J.

BROWN, J.   We reverse these two companion cases, which we understand will necessitate new trials, because the prosecutor failed to comply with the law regarding disclosure of exculpatory and inculpatory information. We are reversing primarily because, after agonizing appraisal, we are convinced a reversal is the only way to assure each defendant a fair trial and, therefore, to best serve the system of criminal justice.

Richard Woten died of stab wounds about 12:30 a.m. on May 11, 1980 behind an establishment known as Zim-

merman's Bar in Kenosha. Raul Ruiz and Antonio Servantez were subsequently tried and convicted of being parties to the crime. Ruiz and Servantez had separate trials and separate attorneys, both of whom are able; Ruiz was tried first. Each appellant testified at his own trial, implicitly pointing the finger at the other as being the culprit while maintaining complete innocence for his own part.

The prosecutor found out some information during the Ruiz trial which inculpated Servantez and was exculpatory as to Ruiz. The information was that Casey Ostrowski, a witness for the state in each case, had overheard a conversation during a car ride in Racine. During the conversation, which occurred within days of the murder, Joe Sanchez reportedly asked Servantez "if he got rid of the knife." Servantez answered that he had. At the preliminary hearing and other proceedings which occurred before the trials, Ostrowski denied hearing any conversation in the car or did not mention she had heard a knife-disposing statement.

The prosecutor did not convey the information to Ruiz' attorney, Martin Hanson. Nor did he tell Servantez' attorney, Thomas Tofte, about the possible change in Ostrowski's version of the car ride, electing, rather, to spring the testimony in the middle of the Servantez trial. The trial court ultimately ruled that the prosecutor should have disclosed the evidence to both attorneys, and we agree. Ruiz had a right to the evidence because it was consistent with his story that Servantez acted alone. The defense has a right to exculpatory evidence. *See Rohl v. State,* 90 Wis. 2d 18, 279 N.W.2d 722 (Ct. App. 1979), *modified,* 96 Wis. 2d 621, 292 N.W.2d 636 (1980).[1] Ser-

---

[1] The state argues that for several reasons disclosure to Ruiz was not required. We find none of its contentions persuasive. First, it posits that the letter sent by Ruiz' original counsel, Alan Eisen-

vantez was entitled to the information because he had earlier filed a motion, seeking from the court:

an order requiring the District Attorney to furnish the defendant with a written summary of all oral statements which the District Attorney plans to use in the course of trial, together with names of witnesses to the oral statement which the State plans to use in the course of trial pursuant to Sec. 971.23(1) of Wisconsin Statutes.[2]

berg, prior to trial seeking revelation of all exculpatory evidence the state may "have in its possession" limited the prosecutor's discovery obligations to material he knew of when the letter was received. Common sense and virtually unanimous case law tell us that when the defense makes such a request, it wants continual disclosure.

Its next argument is that the statement was not exculpatory because Ruiz was charged as a party to the crime. We think otherwise because if Ruiz' testimony were believed, he would be neither a direct actor nor an aider and abettor. The knife-disposing statement tended to support his version of the event.

Thirdly, the state contends that the exculpatory evidence was not in the sole possession of the state, see State v. Rohl, 104 Wis. 2d 77, 89, 310 N.W.2d 631, 637–38 (Ct. App. 1981), because the defense could have continued to interview Ostrowski during trial. The trial court adequately pointed out the difficulty with putting this burden on the defense attorney:

And I don't believe Mr. Hanson would be able to fulfill his duty to his client by trying this lawsuit and still run around talking to various witnesses at the point of the trial he was clearly occupied with trying this lawsuit with what he knew about it.

Finally, the state argues disclosure was not required because the statement would have been inadmissible in Ruiz' trial. We think there is, at the very least, substantial room for debate on the question. See footnote 7. Under such circumstances, disclosure should be made. See Nelson v. State, 59 Wis. 2d 474, 484, 208 N.W.2d 410, 414 (1973).

[2] Section 971.23(1), Stats., states:

(1) DEFENDANT'S STATEMENTS. Upon demand, the district attorney shall permit the defendant within a reasonable time before trial to inspect and copy or photograph any written or recorded statement concerning the alleged crime made by the defendant which is within the possession, custody or control of the

When a demand for prior oral statements of the defendant which the state intends to use at trial is made, the prosecution has a continuing duty to reveal all such statements which it subsequently discovers.[3] Sec. 971.-23(7), Stats.[4]

state including the testimony of the defendant in an s. 968.26 proceeding or before a grand jury. Upon demand, the district attorney shall furnish the defendant with a written summary of all oral statements of the defendant which he plans to use in the course of the trial. The names of witnesses to the written and oral statements which the state plans to use in the course of the trial shall also be furnished.

[3] The state also makes two arguments that disclosure to Servantez was not mandated, neither of which have merit. First, it argues that the defense motion for disclosure of prior oral statements did not constitute a "demand" under sec. 971.23(1), Stats.; the state posits that a motion is more a "request" than a "demand." We refuse to engage in such a hypertechnical reading of the statute. The motion informed the state that the defense desired its statutory discovery rights. *See also Nelson,* 59 Wis. 2d at 485–86, 208 N.W.2d at 415. Further, the state has apparently not previously raised the issue; it has waived its right to do so. *See State v. Brown,* 96 Wis. 2d 258, 263, 291 N.W.2d 538, 541 (1980); *Klimas v. State,* 75 Wis. 2d 244, 246, 249 N.W.2d 285, 286 (1977). Finally, at the motion hearing, an assistant district attorney told the court the state had no objection to the discovery: "Obviously we have no objection since that's the law."

The state also argues the statement was not one the prosecutor "plan[ned] to use at trial" within sec. 971.23(1), Stats., because he did not know Ostrowski would unsheathe the knife-disposing account. (The trial court indicated it believed the prosecutor was not certain how she would ultimately testify.) The point, however, is that the district attorney asked a question which could elicit the damaging evidence. To say that the prosecutor need disclose only what he is absolutely certain the witness will repeat would make a mockery of the discovery provisions.

[4] Section 971.23(7), Stats., states as follows:

(7) CONTINUING DUTY TO DISCLOSE: FAILURE TO COMPLY. If, subsequent to compliance with a requirement of this section, and prior to or during trial, a party discovers additional material or the names of additional witnesses requested which are

The defendants bring their appeals primarily under the rubric of "prosecutorial misconduct."[5] The trial court found that concealment of the evidence was present but characterized the concealment as one of "misjudgment" or, alternatively, stated that the nondisclosure "was not the intentional type of error that would be considered in the same vein as vindictive prosecution." The trial judge also commented: "I don't think [the nondisclosure] was done for the purpose of sandbagging . . . ." After reading the record in these two cases and others that have preceded it, our conclusion of law is somewhat different. We conclude the nondisclosure was the result of, if not a deliberate act of suppression, a complete and total disregard of duty and indifference to present legal obligations on the part of the Kenosha prosecutor's office. To find *anything* less would be to ignore a continuing pattern of nondisclosure, buttressed by the prosecutor's inadequate explanations for this—the latest incident involving suppression of evidence from an accused.

None of the prosecutor's reasons for nondisclosure made to the trial court in either case makes any sense.

subject to discovery, inspection or production hereunder, he shall promptly notify the other party of the existence of the additional material or names. The court shall exclude any witness not listed or evidence not presented for inspection or copying required by this section, unless good cause is shown for failure to comply. The court may in appropriate cases grant the opposing party a recess or a continuance.

[5] The state argues the defense in Servantez waived the issue of prosecutorial misconduct by not immediately objecting to the knife-disposing evidence. This position is without merit. Attorney Tofte made objection at the end of the state's direct examination of Ostrowski. This gave the trial court an opportunity to rule on the matter which, after all, is the purpose of requiring timely objection. It also appears that the state's position has been waived under *Klimas*, 75 Wis. 2d at 246, 249 N.W.2d at 286.

For example, as to disclosure to Servantez of the prior oral statement, the prosecutor argued that the discovery statute does not obligate the state to turn over statements made to witnesses who are not law enforcement personnel. In fact, there is a case on point which holds exactly the opposite. *Kutchera v. State,* 69 Wis. 2d 534, 544–45, 230 N.W.2d 750, 756 (1975). The prosecutor also said he was uncertain Ostrowski would repeat the statement under oath. The fact remains, however, that the witness was asked an open-ended question as to "what was said" in the car. As to nondisclosure to Ruiz, the prosecutor at one point explained that Ostrowski's revised recollection was questionable because it was refuted by Joe Sanchez and contradicted by her earlier testimony; thus, in his view, it was inadmissible hearsay. As the trial court pointed out, however, it is the court's function, not the prosecutor's, to determine what may and may not be admitted into evidence. *See Nelson v. State,* 59 Wis. 2d 474, 484, 208 N.W.2d 410, 414 (1973). Further, the notion that concern for the truth-seeking function of the trials motivated the nondisclosure is called into question by the manner in which the statement was ultimately disclosed. Not only was it withheld from Attorney Hanson, who might have been able to use it to buttress Ruiz' story that Servantez acted alone or to impeach Ostrowski's testimony, but from Tofte as well. It was then sprung without warning during the Servantez trial when, whether it was believable or not, it could do the most damage. These tactics show not a regard for fairness and the truth but, rather, an interest solely in how evidence will best aid the prosecution. At another juncture, the prosecutor said there was no way to know whether the conversation was connected to the murder, implying this justified nondisclosure. This explanation strains the imagination; how could anyone believe that such a statement by a co-defendant in a stabbing case was not related to the crime? Further, if

the prosecution actually believed that the events which occurred within days of the murder were unconnected to the crime, why was Ostrowski questioned about the car ride at the Servantez trial?

In addition to the numerous questionable answers supplied by the prosecutor at various points in the proceedings, we note that this is not the first time this court has been faced with a challenge to the attitude of this same prosecutor towards release of information to which the defense is entitled pursuant to statute and case law. In an unpublished decision of this court, of which we take judicial notice, *State v. Copening*, No. 79–246–CR unpubl. slip op. (Wis. Ct. App. Jan. 10, 1980), rev'd, 100 Wis. 2d 700, 303 N.W.2d 821 (1981), a mistrial was granted because the prosecutor, for no good reason and despite trial court remonstrations that he comply with the law, neglected to comply with the requirements of sec. 971.24(1), Stats., which requires that written statements of witnesses be given to the opposition in advance. Calling the prosecutor's action a "flagrant violation of the statutory mandate," *Copening*, unpubl. slip op. at 5–6, and emphasizing that disregard of a trial court's "prior ruling cannot be condoned or tolerated," this tribunal concluded that the conduct constituted prosecutorial overreaching which operated to bar retrial of the defendant under the double jeopardy clause. *Copening*, unpubl. slip op. at 5. Although the supreme court reversed our holding that prosecutorial overreaching occurred, it had no quarrel with our characterization of the prosecutor's conduct, alternatively describing it as "inexcusable," 100 Wis. 2d at 716, 303 N.W.2d at 830, and "an insult to the institutional values of an orderly trial." *Id.* at 719, 303 Wis. 2d at 831.

Similarly, in *State v. Lamboy*,[6] another unpublished decision of this tribunal of which we take judicial no-

---

[6] No. 81–196–CR unpubl. slip op. (Wis. Ct. App. Dec. 22, 1981).

tice for purposes of this discussion the Kenosha district attorney's office failed to promptly disclose exculpatory evidence tending to show the defendant could not have formed the intent to commit first-degree murder. There, as in the Servantez post-conviction motion, the defendant offered a series of cases to show that it was the practice of the prosecutor's office to withhold evidence. Despite the record made, this court indicated we were not yet convinced the conduct of the Kenosha district attorney's office showed an intentional pattern of suppression. We acquiesced in the state's explanation that the nondisclosure was a result of the district attorney's inaccurate assumption that he was the judge of what was and was not exculpatory evidence. We, however, advised that the adversary system is not an end in itself but a means to search for the truth; we cautioned that, when in doubt, disclosure is required. The advice in *Lamboy* came soon after *Copening*. The instant appeals indicate the warning signs in *Copening* have been, if not unnoticed, unheeded. We further note that the same or similar nondisclosure allegations have surfaced in other unpublished Kenosha county cases of which we take judicial notice. *State v. Dissmore,* No. 80–1178–CR unpubl. slip op. (Wis. Ct. App. Oct. 7, 1981) ; *State v. Vite,* No. 80–1194–CR unpubl. slip op. (Wis. Ct. App. June 5, 1981) ; *State v. White,* No. 79–1559–CR unpubl. slip op. (Wis. Ct. App. July 14, 1980). In each of these cases, we affirmed.

Nevertheless, the state urges us to look at all of the evidence adduced against Ruiz and Servantez and conclude the nondisclosure to them was mere nonprejudicial error not requiring reversal under traditional harmless error doctrine. Under the relevant standards, Ruiz would be entitled to a new trial if the nondisclosure of the exculpatory evidence could have affected the jury

verdict. *See Rohl*, 90 Wis. 2d at 35–36, 279 N.W.2d at 728. In the Servantez situation, where the nondisclosure involved a violation of statutory rather than constitutional precepts, reversal is warranted if, absent the error, the result might probably have been more favorable to the defendant. *See State v. Gavigan*, 111 Wis. 2d 150, 162–63, 330 N.W.2d 571, 578 (1983). The trial court held that in view of the other evidence, the error was harmless in each case.

Review of the evidence indicates that under normal circumstances, a finding of harmless error by using the standard formula would certainly be appropriate. The circumstantial evidence adduced paints a picture of racial animosity on the part of the defendants which resulted in a confrontation beginning in the late night hours of May 10 and leading up to a murderous attack on Woten. The sequence of events began about ten o'clock in the evening when Raul Ruiz, Antonio Servantez and John Reyes arrived at the home of Casey Ostrowski, who lives across the street from Zimmerman's Bar. Shortly thereafter, Ruiz went to the tavern to play pool. He became involved in a dispute over the use of the game tables. Ruiz was asked to leave, and when he refused, the police were summoned. The police escorted Ruiz from the premises.

Ruiz returned to the home angry and, according to Ostrowski, said to Servantez: "Them honkies messed over me, we going to let them get away with it?" Shortly after this conversation, Ruez, Servantez and Reyes left to purchase some beer. Servantez and Reyes went into Zimmerman's and stayed a short time. They then left, and the threesome stood on the sidewalk outside the bar. Shortly thereafter, Michael Haubrich attempted to leave the bar. He testified that as he stepped out the door, Ruiz took a swing at him and "nicked" him. As he was struck, he heard Ruiz call him a "f---ing honky."

Upon learning of the incident, other bar patrons exited into the street, apparently intending to even the score. The police were again called. They talked to Ruiz at the Ostrowski home, who indicated he had not returned to the bar. The officers left the area around midnight after advising the owner's son, Joe Zimmerman, that it might be a good idea to close the tavern early that night. Zimmerman agreed and instructed the bartender to close up.

Meanwhile, Woten, who had been at the bar earlier to cash a check, returned looking for Joe Zimmerman. The bartender said Joe had left. Helen Bartholemew lives in a second-floor dwelling in the neighborhood of Zimmerman's Bar. Her home overlooks an alley that runs behind the tavern. She testified that about 12:15 a.m. that night, she saw two people run through Zimmerman's parking lot. She then heard feet shuffling and a thud that sounded as if something had hit the garage located adjacent to the alley.

Interested in what was going on, she went onto her porch and called out. She looked down and saw two people standing near the garage; one of the individuals was bent over something lying on the ground. After she called out, the individual standing upright said: "Let's get out of here, they're after us already." He then moved quickly away from the area. The person who was over the object looked up and told Bartholemew that the object on the ground was his friend Frank and that the person was sick.

Inferentially, it was Servantez and Ruiz who Bartholemew saw in the alley next to Woten's body. Ruiz testified at his trial and acknowledged it was he who reported the thing on the ground was his sick friend. Also, Ruiz' pants had a blood spot on them that was the same type as Woten's. He testified, however, that he arrived at the scene only after Woten was down. Like-

wise, Servantez took the stand in his defense and acknowledged he made a statement in the alley to Ruiz but that all he said was "come on." He claims he observed Ruiz fighting in the alley but took no part in the conflict.

The two men then returned to the Ostrowski home. They entered as Ostrowski was coming upstairs from her basement to answer the phone; she had been playing pool with Reyes. Ostrowski reported that Servantez had fresh grass stains on his hand; there was evidence that a grass strip runs through the alley. His shirt was open when he entered. It had not been open earlier in the evening, and loose buttons were found at the murder scene. Ostrowski reported that both men were out of breath, as if they had been running. She testified she overheard Ruiz tell another resident of the home, Gloria Delgado, that they had beaten up and kicked some guy, and, as they did so, the victim was asking, "why me, why me?" Servantez also reportedly said that they had beaten someone up, and the individual had thrown up on him.

In the Servantez case, the state also called Gloria Delgado. She denied hearing statements from the two men concerning kicking, beating up another, or the illness of the victim. In statements attributed to her in a police report made within days of the event, however, Gloria said she heard Servantez say, after the two men returned to the house, "we got one of the mother f---ers." Ruiz' response was that "we got the wrong one." According to Gloria's statement, Servantez then said that "the mother f---ers are all alike," and "we should have used a gun."

About fifteen minutes after the men reentered the home, Ostrowski heard sirens outside. According to her, Ruiz, seeing the police were outside, requested that the others turn the lights and music off, close the drapes and

get down on the floor. Noting the commotion outside, Ostrowski remarked to Ruiz that they must have beaten the individual severely. Ruiz then told Servantez that the police were outside.

Ultimately, the police obtained Ostrowski's permission to enter and search her home; they were looking to question the individuals who had been involved in the earlier tavern disturbances. When they entered at 4:00 a.m., Ruiz was asleep in a bedroom and Servantez had left, apparently through a bathroom window. Ostrowski testified that she later discovered that a knife was missing from her home.

Were it not for the history of abuse of which we are aware and the clarity with which this record indicates we are facing yet another case where a Kenosha prosecutor has improperly withheld evidence until it could be most effectively used against an accused, we might be persuaded that application of the normal harmless error standards to this evidence is appropriate. We expressly refuse to decide whether the standard tests as stated in *Rohl* and *Gavigan* are satisfied, however, because we think that the situation in Kenosha county has reached a point where our decision must be prospective looking as well as remedial. The issue is no longer only how certain we can be that the jurors would not have changed their minds about the guilt of an individual defendant, but how the Kenosha prosecutors can be persuaded to respect the valued institutional objective of conducting orderly trials.

When, as the foregoing displays, the office of the district attorney has undertaken to prosecute cases with utter disregard for the statutory and constitutional discovery rights of the accused, we think the standard on appeal approaches automatic reversal; all the defendant need show is that the nondisclosure resulted in some

prejudice. This standard is appropriate because this kind of prosecutorial conduct harms not only the individual defendant but the very integrity of the judicial process. That the test we are invoking is proper is supported by our supreme court's closing remarks in *Nelson,* where it prophesized that cases might arise where serious misconduct would justify reversal *even absent prejudice:*

While the state committed constitutional error in the suppression of exculpatory evidence, such error did not constitute prejudicial error or require a new trial in the interest of justice. *This is not a case wherein the serious misconduct of the prosecutor necessitates a new trial, even in the absence of a showing of prejudice, in order to sustain the integrity of the judicial process.* A conviction obtained by means of a fair trial will not be overturned and a new trial granted to punish society for the non-prejudicial misconduct of the prosecutor. [Emphasis added; footnote omitted.]

*Nelson v. State,* 59 Wis. 2d at 487, 208 N.W.2d at 416. The *Nelson* court took its cue from then Judge Burger's dissent in *Levin v. Katzenbach,* 363 F.2d 287, 294 (D.C. Cir. 1966), where he said:

[D]eliberate suppression of evidence [is a type] of conduct which not only prejudice[s] the defendant but also violate[s] the law, the basic duty of the prosecutor as an officer of the Court, and the very integrity of the judicial process. Such conduct is impermissible. *As a result, a showing that the prosecution knowingly suppressed relevant exculpatory evidence automatically entitles the defendant to a new trial, with little or no showing of prejudice.* [Emphasis added; footnote omitted.]

*See also Kyle v. United States,* 297 F.2d 507, 514 (2nd Cir. 1961). Certainly, in both of the cases before us, some prejudice has resulted from the nondisclosure.

When asked, Attorney Hanson stated he would have attempted to use the evidence in the Ruiz trial had he

known of it. We find his statement compelling. Hanson, we think, would have tried to repeatedly emphasize Servantez' possession of the knife after the crime in order to lend credence to Ruiz' implication that Servantez murdered Woten alone and that he arrived shortly thereafter. In the alternative, the information might have been used by Hanson to impeach Ostrowski's testimony; she did not disgorge to police investigators the content of the conversation and actively denied hearing any conversation in prior sworn testimony.[7] Had Ostrowski's testimony been seriously discredited, much of the damning evidence against Ruiz might have fallen by the wayside.

Similarly, in the Servantez trial, the nondisclosure dealt a blow to the defense plan. During the mistrial motions, Attorney Tofte told the judge that he had not planned to impeach Ostrowski because much of what she said corroborated Servantez' version that Ruiz acted

---

[7] The most cogent harmless error argument advanced by the state is that we should forgo giving Ruiz a new trial because even if Attorney Hanson had known of the evidence, he could not have introduced it, since it is excludable as hearsay. As we hope the tenor of our opinion suggests, this is not the point. The important factor is that the trial judge, because of the prosecutor's concealment of the evidence, never had an opportunity to rule on the question, which we see to be a complex one. Had the defense known of the evidence and the issue been before the trial court, we think Hanson probably would have argued the information was admissible under sec. 908.045(4), Stats.; or that the statement, if used to impeach Ostrowski, was not hearsay because not being used to prove the truth of the matter asserted (that Servantez got rid of the weapon) see sec. 908.01(3); or that due process/compulsory process clause cases such as *Chambers v. Mississippi*, 410 U.S. 284 (1973), require admission of the statement. We expressly refuse to undertake to resolve the question, leaving this to the trial court should it arise again. We reemphasize that the thrust of this opinion is not only whether harmless error applies, but how we can serve the *long-range goals* of judicial economy by preventing repeated appeals from Kenosha county on the nondisclosure subject.

alone. Indeed, our review of the trial record shows this was a plausible strategy. Ostrowski's testimony that Ruiz was angry over being involved in the earlier police confrontations supported the conclusion that Ruiz had a stronger motive for attacking a white victim. Her testimony of what occurred when the two men reentered the home after being in the alley arguably points a guilty finger more directly towards Ruiz than Servantez— damaging incriminatory statements were attributed to Ruiz, and his actions demonstrated guilty knowledge.

Because prior to the knife-disposing testimony Tofte planned not to attack Ostrowski's credibility but to emphasize the elements of her testimony which supported Servantez' version, he did not do much of the work he would have done had he known Ostrowski had a revised recollection of the event. First, he indicated that the defense would have opted for an opening statement and told the jury of the existence of the damaging evidence and explained that Ostrowski had not previously remembered the conversation. This, we agree, might have lessened the impact of the weapon-disclosing evidence or, at least, have given the jury a more constructive vantage point from which to assess its believability.

Second, Tofte said he would have investigated more fully the effect alleged pretrial threats had on Ostrowski. Allegations were made that Ostrowski was threatened by Servantez' brother in order to persuade her not to testify. Tofte said it would have been advantageous to show she lied about the threat because such information would have supported the position that she was lying about the defendant subsequently having the knife.

Third, Tofte said he would have investigated Ostrowski's friends and relatives and alleged threats from the welfare office concerning custody of her child to determine whether she had any motivation or self-interest

for fabricating the weapon-disclosing conversation. In sum, equipped with the tools to which it was entitled, the defense in this case might have been able to completely discredit a principal witness. Under the standard we have stated, the Servantez conviction, too, must be reversed.

We note at this point that we think it is extremely unfortunate that the prosecutor's nondisclosure must occasion added expense for the system and further inconvenience and pain for the relevant witnesses. We are especially concerned because of the trauma new trials will cause the victim's family. However, prosecutors must be made to realize that the practice of not disclosing evidence which the defense has a right to have in advance is not only damaging to the integrity of the judicial system but increases the risk that the system will convict an innocent person.

We add that we do not deem it to be a complete and total disregard of duty and indifference to present legal obligations in every isolated instance where nondisclosure on the part of the prosecution has been found. We limit the holding to the particular situation here where a continuing pattern of nondisclosure has emerged and where the district attorney's explanations were totally unsatisfactory. Having been criticized by the supreme court and this court and having knowledge of repeated claims of nondisclosure being an issue on appeal, the prosecutor here is held to complete and total disregard of duty. Thus, the lower harmless error standard has been *per force* necessitated.

Because we anticipate that both men will be retried, two other issues must be addressed. The first involves the seizure, testing and use at the Ruiz trial of trousers belonging to him. The record shows that Ruiz was asleep in the Ostrowski home when the police entered it at about 4:00 a.m. on the morning of Woten's death. Lieutenant

Ayres of the Kenosha police woke Ruiz and asked if he would go to the police station with them. Ruiz asked the police why they wanted to speak with him. Ayres told him that there had been a homicide, a body found in an alley and that they wanted to see if he knew anything about it. According to Ayres, Ruiz then "voluntarily came with us." Officers Anderson and Pieri then drove him to the police station. When asked whether he would have released Ruiz had he attempted to leave, Anderson said that he would not have released him without checking with his superiors. The trial court found that no handcuffs were ever put on Ruiz. At the station, Ruiz encountered Detective Serpe, who had been assigned to investigate the homicide. Shortly after they began to talk, Serpe noticed what appeared to be a small bloodstain on Ruiz' pants. The pants were subsequently seized, and Ruiz was placed in a cell.

The bloodstained pants were introduced during the state's case. A serologist was called to testify and reported that he had tested the blood on the pants as well as blood samples from Ruiz, Servantez and Richard Woten. The serologist testified that the blood on the trousers could not have come from Ruiz or Servantez. The stain was, however, consistent with Woten's blood type. The expert also ran enzyme tests on the Woten sample and bloodstain. The blood on the trousers was in all ways consistent with Woten's blood. The serologist noted that only two percent of the population had the blood and enzyme combination found in Woten's sample and in the bloodstain.

Ruiz argues that the pants should have been suppressed because they were obtained by Detective Serpe as a direct result of an illegal arrest. We disagree and conclude they may be introduced into evidence at a subsequent trial.

The trial court concluded that the pants were properly taken under the plain view doctrine. This exception to

the warrant requirement may justify a seizure where the following criteria are met:

(1) The officer must have a prior justification for being in the position from which the "plain view" discovery was made;

(2) The evidence must be in plain view of the discovering officer;

(3) The discovery of the evidence must be inadvertent; and

(4) The item seized, in itself or in itself with facts known to the officer at the time of the seizure, provides probable cause to believe there is a connection between the evidence and criminal activity.

*Bies v. State*, 76 Wis. 2d 457, 463–64, 251 N.W.2d 461, 464–65 (1977). At the pretrial suppression hearing, Ruiz attempted to challenge the existence of the first factor, *i.e.,* he argued that there was no probable cause to arrest and take him to the station, and, therefore, Serpe had no prior justification for being in the position from which the plain view discovery was made. The trial court ultimately concluded that a finding on the probable cause issue was not necessary because Ruiz had voluntarily accompanied the police to the station house.[8] The "prior justification" required in the plain view doctrine was satisfied, then, because Ruiz had consented to tell the police what he knew at the station.

[8] When this case first came here on appeal, there had been no factual findings concerning the events that surrounded Ruiz' trip to the police station. Because we concluded that the "prior justification" requirement in *Bies* required an explanation as to how Serpe came into contact with Ruiz, we remanded the record to the trial court. The trial court's conclusion that Ruiz consented to the trip was the result of this remand. After the trial court's decision, the defendant requested supplemental briefing on whether *Dunaway v. New York*, 442 U.S. 200 (1979), was applicable to this case. We granted the request. Briefing was completed on April 11, 1983.

Unless factual findings by the trial court are contrary to the great weight and clear preponderance of the evidence, they must be deferred to on appeal. *See Cogswell v. Robertshaw Controls Co.,* 87 Wis. 2d 243, 249, 274 N.W.2d 647, 650 (1979). The trial court's finding that Ruiz volunteered to go with Ayres meets this test. Each of the officers who testified said that handcuffs were not used on Ruiz. Although Anderson stated that he would have checked with his superiors before releasing Ruiz, the situation never arose. The fact that Ruiz never expressed a desire to go elsewhere supports an inference that he was voluntarily cooperating with a police investigation. Further, Ayres testified that Ruiz continued to cooperate at the station, telling the detectives he had nothing to hide and was willing to give a statement. Finally, Ayres' report of his encounter, made contemporaneously with the events of that night, states that Ruiz did not "refuse" when he was told the police wanted to talk to him at the station; the report said Ruiz "cooperated with us."

Ruiz claims the teaching of *Dunaway v. New York,* 442 U.S. 200 (1979), is pertinent to this set of circumstances In that case, a police official, although there was not probable cause for an arrest, ordered that the defendant be picked up and brought in. The defendant was located at a neighbor's house, and, although he was not told he was under arrest, the suspect would have been physically restrained if he had attempted to leave. He was then driven to police headquarters in a squad car and placed in an interrogation room where he was questioned by officers after being read the *Miranda* warnings. Inculpatory statements and evidence were obtained. One significant difference, however, is that the trial court in *Dunaway* found the defendant had not consented to the trip downtown. The defendant submits,

however, that the Supreme Court left little doubt that had the trial court's finding been different, it would not have considered the difference controlling. The defendant seizes upon language in *Dunaway* that the detention of the defendant was indistinguishable from a traditional arrest, and, therefore, a seizure had taken place:

> Petitioner . . . was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that petitioner was not told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, . . . obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in Terry and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause. [Citation omitted.]

*Dunaway*, 442 U.S. at 212–13. We acknowledge that the facts in *Dunaway* make this a close case, but it is not a mirror image. In *Dunaway*, the officer testified he would have restrained the defendant had the defendant refused to accompany the officers to the station. That is not the case here. The officer in this case only indicated that if Ruiz wanted to leave, once at the police station, the officer would have had to check first with his superiors. The difference, although subtle, does not evince a certain intent to restrain Ruiz' freedom to walk away.

We cannot, moreover, sweep away the more significant distinction that in *Dunaway* the trial court had ruled there was an involuntary seizure; here, the trial court ruled that Ruiz voluntarily came to the station. The *Dunaway* Court itself recognized the difference. The Court wrote that while the prosecution contended the petitioner accompanied the police voluntarily and therefore was not seized, the trial court found otherwise. *Id.* at 207 n. 6. We cannot prophesize what the result in *Dunaway* would have been had the trial court found differently. Indeed, the Supreme Court never hinted as such. To do so, the Court would have had to rule in *dicta* that the trial court's decision, even if it had been the other way, would have amounted to seizure as a matter of law. Because the Supreme Court decision did not state that the facts in *Dunaway* created seizure *per se,* neither can we. We will not upset the trial court on a finding of fact absent a clear obligation to do so.

The second additional issue we must discuss is Servantez' contention that Ostrowski's testimony was incredible and should have been excluded as a matter of law. We agree with the trial court's assessment that Ostrowski's credibility is a matter for the jury to determine, and, therefore, her testimony was properly received. The policy of the law favors the introduction of all relevant testimony provided the defense has all the tools to which it is entitled to attempt to discredit the witness, as will be the case when the defendants are retried.

*By the Court.*—Judgments and order reversed.