STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Media DeLAO, Defendant-Appellant.

Supreme Court

*No. 00–1638–CR. Oral argument November 9, 2001.—Decided May 7, 2002.*

2002 WI 49

(Also reported in 643 N.W.2d 480.)

For the plaintiff-respondent-petitioner the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Steven P. Weiss,* assistant state public defender.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, State of Wisconsin, seeks review of a published court of appeals decision that reversed Media DeLao's convictions and remanded her case for a new trial.[1] The State argues that the court of appeals erred in determining that the State violated its discovery obligations when it failed to disclose before trial oral statements made by DeLao. In addition, the State asserts that even if it violated its discovery obligations, it did so for good cause, and DeLao was not prejudiced by the admission of her statements.

¶ 2. We determine that the State violated its discovery obligations under the criminal discovery statute, Wis. Stat. § 971.23(1)(b) (1999–2000),[2] when it failed to disclose DeLao's oral statements before her trial began. In addition, we conclude that the State failed to show good cause for its violation and that DeLao was preju-

---

[1] *See State v. DeLao,* 2001 WI App 132, 246 Wis. 2d 304, 629 N.W.2d 825 (reversing and remanding a judgment and an order of the Circuit Court for Racine County, Dennis J. Flynn, Judge. DeLao was convicted for obstructing an officer, harboring or aiding a felon, and possession of a short-barreled shotgun).

[2] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

diced by the subsequent admission of her statements. Accordingly, we affirm the court of appeals decision.[3]

I

¶ 3. DeLao's boyfriend, Desmond Stalsberg, was a suspect in a May 31, 1999 robbery of a grocery store, along with another man, John Sabala. Detective James Prioletta of the City of Racine Police Department carried out the follow-up investigation of the robbery.

¶ 4. One week after the robbery, Stalsberg and Sabala got into a fight while at DeLao's house. Stalsberg fired shots at Sabala as Sabala fled the house. Investigator Doug Chaussee of the Mount Pleasant Police Department was the central investigator assigned to the shooting, and he interviewed DeLao at her home on the day of the incident. She initially denied involvement with the shooting or knowledge of Stalsberg's whereabouts. However, when Chaussee interviewed her again that night, she admitted that she had been present during the shooting and that Stalsberg had directed her to help him clean up the crime scene. She told Chaussee that she was afraid and that Stalsberg was "acting crazy."

¶ 5. The State filed a criminal complaint against DeLao alleging, among other counts, that she ob-

---

[3] DeLao asks that we address two other issues not decided by the court of appeals. She asserts that the circuit court erred in (1) allowing the State to amend the information after the close of evidence and (2) failing to make a complete record of events surrounding jury deliberations. Because we agree with the court of appeals that DeLao is entitled to a new trial based upon the State's discovery violation, we need not address these two issues.

296

structed an officer and harbored or aided a felon.[4] The charges against her were connected with her conduct after the shooting. The State alleged that she misled the police and cleaned up or sanitized the crime scene.

¶ 6. Sometime after Investigator Chaussee interviewed DeLao about the shooting, he told Detective Prioletta that DeLao may have information about the robbery. Prioletta interviewed DeLao on June 28, 1999, while she was in custody, and he took notes on her oral statements.[5] The focus of his inquiry was on the robbery investigation.

¶ 7. Prior to trial and pursuant to § 971.23(1)(b), DeLao filed a discovery demand requesting that the State provide her with written summaries of any oral statements she made. Her trial was to begin on Tuesday, July 27, 1999. On Sunday, July 25, Investigator Chaussee spoke with Detective Prioletta, who informed Chaussee of DeLao's statements, which indicated that she was not afraid of Stalsberg.

¶ 8. The trial proceeded as scheduled, and during DeLao's opening statement, her attorney told the jury that DeLao would testify and explain that she acted out of fear of Stalsberg. Her attorney said that DeLao's case could be summed up in one word, "survival," and

---

[4] DeLao was also charged with two counts of possession of a short-barreled shotgun or rifle and possession of drug paraphernalia. She was acquitted of the harboring or aiding count as originally charged under Wis. Stat. § 946.47(1)(b), but at trial the State amended the information to include a harboring or aiding charge under § 946.47(1)(a) for which she was convicted.

[5] Detective Prioletta testified that he interviewed DeLao on June 28, but the court of appeals decision states the date as June 29. The exact date is unimportant for purposes of our decision.

297

concluded the opening statement with an acknowledgement that DeLao lied to police but did what she did because she was afraid.

¶ 9. After the State rested its case in chief on the second day of trial, the prosecutor informed the circuit court of DeLao's statements to Detective Prioletta. Indicating that the State intended to use the statements to impeach DeLao, the prosecutor explained that although Investigator Chaussee knew of DeLao's statements before the trial began, the prosecutor had not learned of them until that morning.

¶ 10. DeLao objected to the admissibility of the statements, arguing that the State violated the criminal discovery statute. After the circuit court overruled her objection, she moved for a mistrial. Her counsel explained that DeLao's decision to testify had depended on the information the State provided before trial. Because DeLao's theory of defense was coercion, it was her position that it would be prejudicial to allow the State to cross-examine her based on undisclosed statements that indicated she was not afraid of Stalsberg. At the same time, counsel noted, if DeLao failed to take the stand contrary to what the defense promised, "then I have basically lied to the jury."

¶ 11. Denying DeLao's motion for a mistrial, the circuit court disagreed that the statements would be prejudicial, and the State proceeded to cross-examine DeLao using the statements. After DeLao testified, the State called Detective Prioletta to the witness stand as part of its rebuttal case. He testified that when he spoke with DeLao, she never expressed any fear of Stalsberg.

¶ 12. In its closing argument, the State maintained that DeLao's statements to Detective Prioletta were inconsistent with her coercion defense. The jury found DeLao guilty, and she appealed.

¶ 13. Reversing DeLao's conviction, the court of appeals determined that the State violated its discovery obligations. In addition, the court determined that the State failed to show good cause for its violation. Concluding that the subsequent admission of DeLao's statements required a new trial, the court reasoned:

> DeLao was caught on the horns of a dilemma, placed in that position by the State—either she must testify and accept the consequences of impeachment, or break her promise to the jury that she would testify and accept the consequences of her broken promise.

*State v. DeLao,* 2001 WI App 132, ¶ 28, 246 Wis. 2d 304, 629 N.W.2d 825. The State petitioned this court for review.

## II

¶ 14. The State asks that we address several issues in resolving this case. The first question we address is whether the court of appeals correctly concluded that the State violated its discovery obligations. This requires the interpretation and application of § 971.23(1)(b) to a given set of facts. It presents a question of law subject to independent appellate review. *See State ex rel. Angela M.W. v. Kruzicki,* 209 Wis. 2d 112, 121, 561 N.W.2d 729 (1997).

¶ 15. Because we conclude that the State violated § 971.23(1)(b), we must also determine whether the State has shown good cause for the violation, and if not, whether DeLao was prejudiced by the admission of her statements. These are also questions of law subject to independent appellate review. *See State v. Messelt,* 185

Wis. 2d 254, 275, 518 N.W.2d 232 (1994) (prejudicial error); *State v. Martinez,* 166 Wis. 2d 250, 259, 479 N.W.2d 224 (Ct. App. 1991) (good cause).

## III

¶ 16. Our interpretation and application of § 971.23(1)(b) involves an inquiry into (1) the scope of the prosecutor's obligation under the statute to make herself aware of evidence against the accused and (2) the meaning of the statutory language, "plans to use in the course of the trial."

¶ 17. Section 971.23, entitled "Discovery and inspection" largely controls the scope of the State's statutory discovery obligations in criminal cases. The portion of the statute that is the focus of our inquiry is subsection (1)(b), which reads:

> (1) WHAT A DISTRICT ATTORNEY MUST DISCLOSE TO A DEFENDANT. Upon demand, the district attorney shall, within a reasonable time before trial, disclose to the defendant or his or her attorney and permit the defendant or his or her attorney to inspect and copy or photograph all of the following materials and information, if it is within the possession, custody or control of the state:
>
> . . . .
>
> (b) A written summary of all oral statements of the defendant which the district attorney plans to use in the course of the trial and the names of witnesses to the defendant's oral statements.

¶ 18. The statute requires the State to provide, within a reasonable time before trial begins, a written summary of the defendant's oral statements that the prosecutor plans to use at trial. Even though the State

300

did not disclose DeLao's statements to Detective Prioletta before her trial began, the State asserts that it complied with § 971.23(1)(b) because the prosecutor could not have planned to use the statements until she knew of them. We reject the State's analysis because it does not comport with the requirements of the statute.

¶ 19. Section 971.23 has been revised over the years, but many of the provisions have remained the same since its creation as three separate statutory sections in the comprehensive 1969 redrafting of the criminal procedure statutes. *Jones v. State,* 69 Wis. 2d 337, 348, 230 N.W.2d 677 (1975); *see also* Wis. Stat. § 971.23, *and compare with* Wis. Stat. §§ 971.23–25 (1993–94), *and with* Wis. Stat. §§ 971.23–25 (1971). Most recently, 1995 Wis. Act 387 repealed, recreated, and renumbered the discovery provisions found in the present version of § 971.23.

¶ 20. Some of the provisions that were new or revised under 1995 Wis. Act 387 were intended to expand the discovery and disclosure requirements that apply to both the State and the defendant. However, the substance of many of the provisions, including what is now subsection (1)(b), has remained essentially unchanged. *See* 1995 Wis. Act. 387; 1995 A.B. 721.

¶ 21. Under § 971.23, the State's discovery obligations may extend to information in the possession of law enforcement agencies but not personally known to the prosecutor. *Jones,* 69 Wis. 2d at 349; *State v. Maass,* 178 Wis. 2d 63, 69, 502 N.W.2d 913 (Ct. App. 1993). Put another way, under certain circumstances, the knowledge of law enforcement officers may be imputed to the prosecutor.

¶ 22. In *Jones,* 69 Wis. 2d at 348–49, this court interpreted the discovery statutes in light of *Wold v.*

301

*State,* 57 Wis. 2d 344, 204 N.W.2d 482 (1973). *Wold,* in turn, adopted the American Bar Association (ABA) Standards Relating to the Prosecution Function and the Defense Function: "The test of whether evidence should be disclosed is not whether in fact the prosecutor knows of its existence but, rather, whether by the exercise of due diligence [the prosecutor] should have discovered it." *Jones,* 69 Wis. 2d at 349 (citing *Wold,* 57 Wis. 2d at 349–50). The court further explained:

> The prosecuting attorney's obligations under this section [of the ABA Standards] extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office.

*Id.* In *Wold,* the court was not interpreting the criminal discovery statutes. Instead, the State's discovery obligation was predicated on the prosecutor's agreement to produce. *See* 57 Wis. 2d at 347. Nonetheless, *Jones* and subsequent cases citing *Wold* have interpreted the discovery statutes to incorporate *Wold*'s rationale, including its reliance on the ABA Standards.

¶ 23. In *Martinez,* the court of appeals stated:

> For purposes of the criminal discovery statutes, we view an investigative police agency which holds relevant evidence as an arm of the prosecution. In most criminal cases, the evidence against the accused is garnered, stored and controlled by the investigating police agency. Depending upon local practice, many courts and district attorneys entrust the custody and control of such material to the police even after it has been elevated to formal evidentiary status in a criminal proceeding.

166 Wis. 2d at 260; *see also State v. Sturgeon,* 231 Wis. 2d 487, 499, 605 N.W.2d 589 (Ct. App. 1999); *Maass,* 178

Wis. 2d at 69–70 (citing *Wold*, 57 Wis. 2d at 349–50). The court in *Maass* determined that the ABA Standards were "codified in sec. 971.23." 178 Wis. 2d at 70. In short, the threads of *Wold* and *Jones* have become tightly woven into the fabric of criminal discovery in Wisconsin.

¶ 24. The prosecutor's duty to obtain information from investigative agencies is not, however, limitless. For example, due diligence does not require that the prosecutor "consult every law enforcement officer who conceivably could have information respecting a case." *Maass*, 178 Wis. 2d at 71. This limitation is consistent with the ABA Standards and in keeping with the principles in *Jones* and *Wold.* The State is charged with knowledge of material and information in the possession or control of others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to the prosecutor's office. *Jones,* 69 Wis. 2d at 349; *Wold,* 57 Wis. 2d at 349 n.4.

¶ 25. We turn next to examine the meaning of the language in § 971.23(1)(b) limiting the State's obligation to disclose a defendant's oral statements to those that it "plans to use in the course of the trial." The State maintains that the phrase "plans to use" embodies a subjective component. According to the State, the prosecutor in DeLao's case could not have planned to use DeLao's statements before DeLao's trial began because a prosecutor cannot plan to use what the prosecutor does not actually know. DeLao asserts, in contrast to the State, that the phrase "plans to use" in § 971.23(1)(b) embodies an objective standard. We agree with DeLao that the standard is necessarily objective.

¶ 26. In advancing a subjective standard, the State relies on *State v. Larsen,* 141 Wis. 2d 412, 415 N.W.2d 535 (Ct. App. 1987). The central issue in *Larsen* was whether the defendant was entitled to a discretionary reversal under Wis. Stat. § 752.35.[6] *Id.* at 416. The defendant advanced a number of arguments in support of his assertion that justice miscarried. One of his several arguments was that he was denied a fair trial because the state failed to comply with § 971.23(1), despite the fact that it had disclosed his statements before the trial began.

¶ 27. The court of appeals devoted only one paragraph of analysis to this argument. It noted that the district attorney explained that he did not intend to use the statements until the defendant filed his notice of alibi. *Larsen,* 141 Wis. 2d at 425. The notice of alibi was filed two weeks before trial and the statements were provided to the defendant one week before trial. *Id.* at 417, 425. In determining that the prosecutor's failure to disclose the statements sooner did not deny the defendant a fair trial, the court referenced the time at which the prosecutor actually decided to use the defendant's statements. *See id.* at 425–26.

¶ 28. We do not view *Larsen* as dispositive of the question before us. The court in *Larsen* was addressing a pretrial disclosure. In the case before us, the disclosure came after the trial began and after the defense committed to a trial strategy based on the information it had at the beginning of trial. The *Larsen* court

---

[6] Wisconsin Stat. § 752.35 states in part:

> Discretionary reversal. In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from.

concluded that given the circumstances of the pretrial disclosure, it could not conclude that justice had miscarried.

¶ 29. More importantly, *Larsen* is not dispositive because the court of appeals was not addressing the scope of the meaning of "plans to use"—the issue before us. Rather, its discussion of the prosecutor's decision was part of its larger determination that the defendant was not entitled to a discretionary reversal in the interest of justice.

¶ 30. Thus, the court of appeals in *Larsen* arguably assumed that § 971.23(1) embodied a subjective standard, without engaging in any construction of the statute as we do today. We interpret the phrase "plans to use" to necessarily embody an objective standard: what a reasonable prosecutor should have known and would have done under the circumstances of the case. An objective standard is consistent with the due diligence-imputed knowledge rule under *Wold* and its progeny.

¶ 31. In contrast, a subjective standard would be difficult if not impossible to reconcile with the rule that a prosecutor is responsible for exercising due diligence in obtaining statements of which she does not know. The State's theory in this case illustrates this problem. Under that theory, the State could escape its obligation to disclose under § 971.23(1)(b) in every case where the prosecutor failed to exercise due diligence by asserting that the prosecutor, not knowing of the evidence, could not have planned to use it.

¶ 32. Likewise, a subjective standard would create an uncomfortably large opening through the door to prosecutorial sandbagging and discovery abuse. Al-

though there is no affirmative evidence of gamesmanship in this case, a subjective standard would invite it in future cases. Moreover, a subjective standard would spawn cases requiring irksome inquiries into the intent of the prosecutor. Thus, the phrase "plans to use" in the statute necessarily embodies an objective standard.

¶ 33. Having examined the scope of the prosecutor's obligation under the statute and the statutory phrase "plans to use in the course of the trial," we turn to an application of § 971.23(1)(b) to the facts of this case. The issue becomes whether a reasonable prosecutor, exercising due diligence, should have known of DeLao's statements before trial, and if so, whether a reasonable prosecutor would have planned to use them in the course of trial. Given all the facts here, we conclude that a reasonable prosecutor should have known of the statements and would have planned to use them.

¶ 34. Investigator Chaussee, who knew of DeLao's statements before trial after speaking with Detective Prioletta, was a key actor in the State's case against DeLao. Over DeLao's objection, Chaussee was not sequestered like the other witnesses. He was allowed to remain with the prosecutor throughout the trial as the State's representative. At the trial conference held prior to the entrance of the jury pool, the prosecutor explained, "Your Honor, Investigator Chaussee was the central investigator that ties all of the ends together."

¶ 35. As the court of appeals concluded, the investigation of the robbery and the investigation of the shooting were "hopelessly intertwined" with respect to DeLao. The two investigations overlapped substantially both in time and in the cast of characters involved. The robbery and the shooting occurred a week apart, and

306

DeLao's testimony revealed that she had a significant history with Stalsberg and Sabala.

¶ 36. Detective Prioletta and Investigator Chaussee were in contact about their investigations. When the discovery issue arose at trial, and after the parties and the court examined Prioletta's report, DeLao's attorney commented:

> Your honor, in this report given to me today, Investigator Chaussee's name is pretty—is made pretty frequent in this report. Investigator Chaussee was the one that told Investigator Prioletta that Ms. DeLao may have information about these robberies.

■

¶ 37. One of the State's arguments in support of its failure to disclose is an assertion that DeLao's statements to Detective Prioletta gained relevance "only when the 'acting out of fear' theory of the defense was revealed during defense counsel's opening statement." In contrast, DeLao maintains that her defense was apparent from the beginning. We agree with the State that the potential relevance of evidence goes to the question of what a reasonable prosecutor would plan to use. However, the State's characterization of DeLao's theory of defense as materializing on the day her trial began is not supported by the facts. DeLao's assessment of the record is more accurate, and the relevance of her statements related not just to the State's ability to rebut her testimony by impeaching her but to her entire defense.

¶ 38. At oral argument in this court, DeLao's counsel advanced: "From the very first night of this crime, Investigator Chaussee interviewed Ms. DeLao . . . she said in her very first statement to him, 'I did what I did because Desmond Stalsberg was acting crazy and I was afraid of him.' "

¶ 39. Although Investigator Chaussee's report detailing his conversations with DeLao on the night of the shooting does not appear in the record, the comments made by DeLao's trial attorney during opening statement, on the record, support this contention. Her attorney asserted, without objection, that on the night of the shooting, DeLao admitted to Chaussee that she previously lied to the police. DeLao's attorney stated: " . . . and she told him why she lied to the police officer. She said I was afraid, Desmond was acting crazy that day."

¶ 40. Even at DeLao's initial appearance, her attorney's comments suggested what her defense would be. DeLao's attorney explained:

> If what is in the criminal complaint is to be believed, what it sounds like is that [DeLao] . . . basically, did not know what to do. This other individual is shooting at someone, out of control, and Ms. DeLao probably didn't know what to do. She was told to clean up the porch and she picked up some gun casings and gave it to the person because there were children in the area.

¶ 41. Again, at DeLao's preliminary hearing, which took place one and one half months before her trial, DeLao's "acting out of fear" defense was raised.[7] DeLao's attorney questioned Investigator Chaussee as to whether DeLao indicated any fear of Stalsberg:

> Q. And that she—Did she indicate to you that she was afraid at the point that she was picking up those shells?

_____

[7] The dissent notes that Judge Flynn, who presided over DeLao's trial, determined that the parties presented him with nothing indicating that the State was aware of any theory of defense before DeLao's opening statement. _See_ dissent at ¶ 124. However, we note that Judge Flynn did not preside at DeLao's preliminary hearing or initial appearance.

308

A. She said she was told to pick them up by Desmond.

Q. And did she indicate that he had a gun at the time he was telling her to do it?

A. He was in possession of a firearm, that's correct.

Q. Did she indicate she was afraid at the time she was doing it?

A. I don't recall her specifically saying that.

Q. Did she indicate to you when you talked with her that basically all she wanted to do was to get Desmond out of her house?

¶ 42. On redirect, the assistant district attorney representing the State also asked Investigator Chaussee whether DeLao told him she feared Stalsberg, to which he replied that he did not recall. Finally, on re-cross of Chaussee, the sole area of inquiry focused on DeLao's fear:

Q. So are you indicating that you just simply don't recollect or are you saying that you just don't remember whether or not she was in fear for her life? She told you she was in fear for her life or that wasn't said?

A. I don't recall it being said.

¶ 43. In short, it seems that from the beginning of this case, DeLao maintained that she did what she did because she was afraid of Stalsberg. From the outset, she admitted that she removed evidence from the crime scene—the basis of the harboring or aiding a felon charge. She acknowledged that she initially lied to the police—the basis of the obstructing charge. Her response to these charges rested not on denying she committed the acts, but rather on a defense that she

309

committed them out of fear. Thus, the record does not support the State's assertion that DeLao's "acting out of fear" theory of defense became apparent only after her trial began.

¶ 44. Also important to our analysis is the nature of the evidence at issue in this case. This evidence consisted of DeLao's own statements, made while she was in custody, to a police officer who was dispatched to interview her by the lead investigator in the case for which she was charged. While we do not suggest that a reasonable prosecutor would know of and plan to use any and all statements by a defendant, these statements were not just any statements.

¶ 45. The State also relies on *Maass,* in which three days before the defendant's trial, a police officer came forward to the prosecutor with incriminating statements the defendant had made to him. 178 Wis. 2d at 65. The defendant, Maass, moved to exclude any testimony by the officer, and the circuit court granted the motion. *Id.* at 66. The court of appeals, however, determined that the State did not violate § 971.23. *Id.* at 73. It noted that the officer did not participate in the investigation or evaluation of Maass's case or regularly report to the district attorney. *Id.* at 72. The court reasoned that the officer's "failure to appreciate the significance of Maass's inculpatory statements and his last-minute disclosure of those statements to the district attorney should not deprive the state of this valuable evidence." *Id.*

¶ 46. The facts of *Maass* are distinguishable from DeLao's case in two important ways. First, the prosecutor in *Maass* notified the defendant of his statements *before* trial began. 178 Wis. 2d at 65. Second, there was no indication that the officer's knowledge in *Maass* was the result of an investigation that was closely inter-

twined with the investigation that resulted in Maass's conviction. The different results in Maass's and DeLao's cases serve to illustrate that the question of whether the prosecutor has exercised due diligence, though ultimately a question of law, will be highly fact-dependent.

¶ 47. Given the coextensive character of the two investigations and Investigator Chaussee's pivotal role in DeLao's case, we determine that a reasonable prosecutor should have known of DeLao's statements before trial began. Chaussee knew of the statements before trial began, and under the facts of this case, the State is charged with Chaussee's knowledge of those statements.[8] In addition, we determine that given all the circumstances, including the fact that DeLao maintained from the outset that she acted out of fear, a reasonable prosecutor who was aware of DeLao's statements would have planned to use them in the course of trial. Therefore, the State violated § 971.23(1)(b) when it failed to disclose the statements before DeLao's trial began.

¶ 48. We next address the State's assertion that the court of appeals decision incorrectly expanded the

---

[8] The dissent's emphasis on City of Racine Detective Prioletta's role in the investigation clouds the focus of the majority opinion. It is Investigator Chaussee who participated in the investigation and evaluation of DeLao's case and reported to the district attorney with respect to her case. Accordingly, it is Chaussee's knowledge, not that of Prioletta, which is imputed to the district attorney. Thus, contrary to what the dissent suggests, our decision does not stand for the proposition that the discovery statute imposes on the district attorney "an undifferentiated duty to consult every law enforcement officer who conceivably could have information respecting a case under investigation." Dissent at ¶ 79 (citing *State v. Maass,* 178 Wis. 2d 63, 71, 502 N.W.2d 913 (Ct. App. 1993)).

State's discovery obligations to include any information requested by a defendant, regardless of whether the information is discoverable under § 971.23. The bulk of the court of appeals' reasoning in support of its determination that the State violated its discovery obligations consists of a discussion of the imputed knowledge rule of *Jones* and *Martinez*. However, paragraph 17 of the opinion reads as follows:

> DeLao requested, pursuant to Wis. Stat. § 971.23(1)(b), "a written summary of any oral, written or recorded statements of the defendant, *but not limited to* those statements which the state intends to use in the course of the trial." (Emphasis added.) Thus, DeLao asked for all statements, not just the ones the State intended to use at trial. The statements in question fell within the purview of her discovery demand. The State made no objection to DeLao's discovery demand as overbroad or beyond the scope of § 971.23(1)(b).

*DeLao,* 2001 WI App 132, ¶ 17. Thus, the State reads the court of appeals opinion to give import to the State's failure to object to DeLao's discovery demand.

¶ 49. As a general rule, the discovery to which a criminal defendant is entitled is limited to constitutional and statutory requirements. *See State v. O'Connor,* 77 Wis. 2d 261, 280 n.7, 252 N.W.2d 671 (1977). Thus, as the State asserts, this court has stated that the discovery statute "controls as to the rights of a defendant as to discovery and the procedures to be followed in enforcing such rights." *State v. Calhoun,* 67 Wis. 2d 204, 217, 226 N.W.2d 504 (1975).

¶ 50. Although we agree with the court of appeals that the State violated its discovery obligations, those

obligations arose under § 971.23 and not as a result of the State's failure to object to DeLao's discovery request. Indeed, at oral argument DeLao unequivocally asserted that throughout this case she has relied not on the State's failure to object but on the statute, arguing that her statements fall within its purview. Accordingly, we reject the court of appeals' discussion to the extent it can be read to suggest that absent an objection, the State is required to provide materials requested by the defendant that fall outside the scope of statutory or constitutional discovery requirements.

IV

¶ 51. Our conclusion that the State violated its discovery obligations under § 971.23(1)(b) does not end our inquiry. The State argues that it had good cause for failing to disclose. Absent a showing of good cause, the evidence the State failed to disclose must be excluded. Wis. Stat. § 971.23(7m); *State v. Wild,* 146 Wis. 2d 18, 27, 429 N.W.2d 105 (Ct. App. 1988).[9] However, if the State can show good cause for its failure to disclose, the circuit court may exclude the evidence or may grant other relief such as a recess or continuance. Section 971.23(7m); *Wild,* 146 Wis. 2d at 27. The burden of proving good cause rests on the State. *Martinez,* 166 Wis. 2d at 257.

¶ 52. The State argues it had good cause for two reasons: (1) it acted in good faith, and (2) even if the prosecutor had known of the statements, she would

_____

[9] This court has criticized the decision in *State v. Wild,* 146 Wis. 2d 18, 429 N.W.2d 105 (Ct. App. 1988), on an unrelated point. *See State v. Eichman,* 155 Wis. 2d 552, 562–63, 456 N.W.2d 143 (1990).

have had no reason to believe that they were relevant to DeLao's case. We have already disposed of the State's second argument by determining that a reasonable prosecutor would have planned to use the statements at DeLao's trial. Having concluded that "plans to use" in § 971.23(1)(b) necessarily embodies an objective standard, we decline to apply a subjective analysis for purposes of good cause. This would create an exception that swallows the rule.

¶ 53. That leaves good faith. Certainly, good faith is an important factor in a determination of good cause. *See Martinez,* 166 Wis. 2d at 259; *Wild,* 146 Wis. 2d at 28. However, it is not by itself dispositive. *Martinez,* 166 Wis. 2d at 259. In any event, we conclude that the State's assertion that it acted in good faith is insufficient to show good cause for its failure to disclose. A closer look at the *Martinez* case illustrates our conclusion.

¶ 54. In *Martinez,* the evidence at issue was a surveillance tape recording of the defendant that incriminated her in a drug deal. Although the State attempted to make the tape available to the defendant in accordance with the defendant's discovery request, the attempt failed and the tape was lost. *Martinez,* 166 Wis. 2d at 253–55. The State conceded that it had "goofed up," but the circuit court allowed police officers who had conducted the surveillance to testify as to their recollections of what they heard. *Id.* at 254, 256. The court of appeals reversed with this explanation:

> The trial court concluded that the state's actions were "simply negligence" and not done in bad faith. We disagree that the facts permitted this conclusion. Instead, the limited facts offered by the state allowed for a host of speculative (not reasonable) inferences as to

the state's conduct—good faith, negligence, reckless-
ness, intentional conduct, or bad faith. This points to
the fundamental problem—the failure of the state to
meet its burden under the statute.

*Id.* at 258 (footnote omitted). The court added that
"[e]ven if the facts could be read to support the trial
court's 'negligence/no bad faith' conclusion, this still
begs the question of 'good cause' under the statute." *Id.*
The court of appeals refused to hold that "negligence or
lack of bad faith constitutes 'good cause' as a matter of
law." *Id.*

¶ 55. Thus, as did the court of appeals in *Mar-
tinez,* we conclude that even if the State acted in good
faith, it failed to show good cause for its failure to
disclose. The State emphasizes that there is no indica-
tion that it engaged in sandbagging or otherwise acted
in bad faith. However, the State's assertions miss the
mark because it has the burden to provide some expla-
nation other than good faith.

¶ 56. Finally, in asserting it has shown good
cause, the State relies on *Tucker v. State,* 84 Wis. 2d
630, 267 N.W.2d 630 (1978). In *Tucker,* the State failed
to supply a defendant with the name of an alibi rebuttal
witness who was able to place the defendant running
from the scene of the crime. *Id.* at 633–34. Another
witness whose name the State had provided also placed
Tucker at the scene of the crime. *Id.* The defendant
moved for a mistrial, but the circuit court denied the
motion. *Id.* at 635. After determining on appeal that the
State had committed a discovery violation, this court
concluded that the defendant suffered no prejudice and
that a new trial was unnecessary. *See id.* at 639, 641. In
so concluding, the court noted that the prosecutor did
not know that the rebuttal witness would identify the
defendant until one-half hour before trial and indicated

that this "may have been good cause for granting a recess or continuance." *Id.* at 640.

¶ 57. We are not persuaded that this language in *Tucker* means that the State has shown good cause in DeLao's case. The court in *Tucker* did not analyze the question of whether the prosecutor's failure to know of the witness's statement was or was not excusable for good cause, and the facts recited in the case do not suggest an answer.

¶ 58. Under *Martinez,* some explanation in addition to good faith is necessary, and the State has been unable to provide that explanation here. As we have already determined using the objective standard embodied in § 971.23(1)(b), the fact that the prosecutor in DeLao's case did not actually know of the evidence is no explanation at all. In short, the State has failed to demonstrate good cause for its violation of the discovery statute. Therefore, DeLao's statements should have been excluded.

V

¶ 59. Having determined that DeLao's statements should have been excluded because the State violated § 971.23(1)(b) without good cause, we address the question of whether the admission of DeLao's statements was prejudicial to her case, thus requiring a new trial. The State asserts there is no prejudice here.[10]

_____

[10] The court of appeals did not employ a harmless error analysis in deciding that DeLao was entitled to a new trial. Neither DeLao nor the State briefed or argued the question of whether a new trial is warranted in the express terms of a harmless error analysis. Nevertheless, the dissent is correct that some of the case law addressing the proper remedy for a discovery violation refers to harmless error. *See State v. Ruiz,*

¶ 60. When evidence that should have been excluded under § 971.23 is not excluded, the defendant is not automatically entitled to a new trial. *State v. Ruiz*, 118 Wis. 2d 177, 199–200, 347 N.W.2d 352 (1984); *Kutchera v. State*, 69 Wis. 2d 534, 544–45, 230 N.W.2d 750 (1975). If the defendant is to receive a new trial, the improper admission of the evidence must be prejudicial. *Ruiz*, 118 Wis. 2d at 199. "The penalty for the breach of disclosure should fit the nature of the proffered evidence and remove any harmful effect on the defendant." *Kutchera*, 69 Wis. 2d at 542–43 (quoting *Wold*, 57 Wis. 2d at 351).

¶ 61. We agree with the court of appeals that the State's failure to comply with § 971.23 placed DeLao on the horns of a dilemma from which no judicial remedy other than a new trial could save her. DeLao's own statements were used against her, and those statements were relevant not just as impeachment evidence but as relating to her entire defense. Thus, the State's discovery violation went to the core of her trial preparation and strategy.

¶ 62. By the time the State disclosed DeLao's statements, she had committed to a defense strategy

118 Wis. 2d 177, 198–99, 347 N.W.2d 352 (1984); *Wold v. State*, 57 Wis. 2d 344, 356–58, 204 N.W.2d 482 (1973). We recognize that there has been a "gradual merger of this court's collective thinking in respect to harmless versus prejudicial error." *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985). Regardless of whether the test is prejudicial error or harmless error, or whether any difference between the two remains, our conclusion in this case is the same. The admission of DeLao's statements is sufficient to undermine our confidence in the outcome of her trial. *See id.* at 545.

that was inconsistent with the statements. When the circuit court determined the statements could come in, DeLao had no choice but to break her promise to the jury or take the stand and subject herself to impeachment by evidence that she had not anticipated when she made the promise.

¶ 63. It is particularly significant that the disclosure was in the midst of trial. The primary focus of § 971.23(1)(b) is on disclosure before trial. Indeed, that is the very nature of discovery. "If there is to be pretrial discovery, broad or limited, in criminal cases, defense counsel should be able to rely upon evidence as disclosed by the state; otherwise, the purpose of discovery is frustrated and more injustice is done than if no discovery were allowed." *Wold,* 57 Wis. 2d at 351.

■

¶ 64. We note that two purposes of criminal discovery are to ensure fair trials and to encourage defendants to enter pleas after learning the strength of the State's case. *Irby v. State,* 60 Wis. 2d 311, 320, 210 N.W.2d 755 (1973); *State v. Maday,* 179 Wis. 2d 346, 353, 507 N.W.2d 365 (Ct. App. 1993). Both purposes are thwarted when the State fails to provide the information required of it before trial begins.

¶ 65. Here, the State's discovery violation undermined the essence of discovery. It placed DeLao on the horns of a dilemma and prejudiced her case. She must have the opportunity to choose a strategy and prepare for trial in light of all the evidence that shóuld have been provided her. Therefore, we determine, as did the court of appeals, that she is entitled to a new trial.[11]

---

[11] The court of appeals appeared to assume that DeLao's new trial should encompass all three of the charges for which she was convicted, including the weapons possession charge,

¶ 66. In sum, we conclude that the State violated § 971.23(1)(b) when it failed to disclose DeLao's oral statements before her trial began. In addition, we determine that the State failed to show good cause for its violation. Finally, we conclude that DeLao was prejudiced by the admission of her statements. Accordingly, we affirm the court of appeals decision reversing DeLao's conviction and remanding her case for a new trial.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 67. DAVID T. PROSSER, J. (*dissenting*). Wisconsin Stat. § 971.23 outlines the discovery obligations of the prosecution and defense in criminal cases. This decision represents the most important interpretation of that statute in many years. In my view, the majority opinion abandons precedent, rewrites the statute, and unreasonably enlarges the discovery obligations of prosecutors. Its revision of discovery law is mistaken and unworkable. Moreover, the court's mandate reversing the defendant's three convictions is a disturbing

and we agree. Her theory of defense was that at the time police searched her home, she did not know it contained guns. She testified that on a previous occasion, when either Stalsberg or Sabala brought a gun to her house, she demanded that it be removed. The State's position was that she was lying, and her statements to Detective Prioletta served to undermine her credibility. Thus, DeLao's decision to testify coupled with her statements to Prioletta generated the evidentiary dispute central to the weapons charge, and her conviction on that charge was contaminated by the prejudicial effect of the State's discovery violation.

application of the harmless error rule. Concerned about the consequences of the court's determinations, I respectfully dissent.

## I. THE STATUTE

¶ 68. The focus of attention in this case is Wis. Stat. § 971.23(1)(b) pertaining to oral statements of the defendant "which the district attorney plans to use in the course of the trial." Subsection (1) must be viewed in its entirety, however, so that paragraph (b) can be put in context. Context is important because the construction given to one paragraph in a subsection is likely to affect the construction of other paragraphs.

¶ 69. Subsection (1) of the statute, relating to the obligations of the district attorney, reads as follows:

971.23 Discovery and inspection. (1) WHAT A DISTRICT ATTORNEY MUST DISCLOSE TO A DEFENDANT. Upon demand, the district attorney shall, within a reasonable time before trial, disclose to the defendant or his or her attorney and permit the defendant or his or her attorney to inspect and copy or photograph all of the following materials and information, *if it is within the possession, custody or control of the state:*

(a) Any written or recorded statement concerning the alleged crime made by the defendant, including the testimony of the defendant in a secret proceeding under s. 968.26 or before a grand jury, and the names of witnesses to the defendant's written statements.

(b) *A written summary of all oral statements of the defendant which the district attorney plans to use in the course of the trial* and the names of witnesses to the defendant's oral statements.

320

(bm) Evidence obtained in the manner described under s. 968.31(2)(b), if the district attorney *intends to use* the evidence at trial.

(c) A copy of the defendant's criminal record.

(d) A list of all witnesses and their addresses whom the district attorney *intends to call* at the trial. This paragraph does not apply to rebuttal witnesses or those called for impeachment only.

(e) Any relevant written or recorded statements of a witness named on a list under par. (d), including any videotaped oral statement of a child under s. 908.08, any reports or statements of experts made in connection with the case or, if an expert does not prepare a report or statement, a written summary of the expert's findings or the subject matter of his or her testimony, and the results of any physical or mental examination, scientific test, experiment or comparison that the district attorney *intends to offer* in evidence at trial. This paragraph does not apply to reports subject to disclosure under s. 972.11(5).

(f) The criminal record of a prosecution witness which is known to the district attorney.

(g) Any physical evidence that the district attorney *intends to offer* in evidence at the trial.

(h) Any exculpatory evidence.

Wis. Stat. § 971.23(1) (emphasis added).

¶ 70. Subsection (7) of the statute establishes a continuing duty to disclose, if a prosecutor discovers

additional materials and information.[1] Subsection (7m) authorizes sanctions for failure to comply with discovery requirements.

## II. SCOPE OF PROSECUTOR'S OBLIGATION TO FIND INFORMATION

¶ 71. The first issue in applying Wis. Stat. § 971.23(1) is the scope of the prosecutor's obligation under the statute to seek and find evidence concerning the accused. *See* majority op. at ¶ 16. The introductory sentence of subsection (1) directs the prosecutor to disclose materials and information requested under the subsection if the materials are "within the possession, custody or control of the state." The statute does not define "possession, custody or control of the state," nor does it spell out the prosecutor's duty to locate materials and information so that they come within the possession, custody or control of the state. Hence, the statute requires interpretation.

¶ 72. Over the years, Wisconsin courts have delineated the prosecutor's duty to seek out information for discovery. In *Wold v. State,* 57 Wis. 2d 344, 349, 204 N.W.2d 482 (1973), a case in which the facts predated the statute, the court tracked the commentary to the American Bar Association (ABA) Standards and stated an IDEAL: "[I]t is the prosecutor's duty to acquire *all*

---

[1] Wisconsin Stat. § 971.23(7) reads:

(7) CONTINUING DUTY TO DISCLOSE. If, subsequent to compliance with a requirement of this section, and prior to or during trial, a party discovers additional material or the names of additional witnesses requested which are subject to discovery, inspection or production under this section, the party shall promptly notify the other party of the existence of the additional material or names.

relevant evidence. The duty rests upon the prosecution to obtain *all* evidence in the possession of investigative agencies of the state." *Wold,* 57 Wis. 2d at 349 (citing American Bar Association Project on Standards for Criminal Justice, *Standards Relating to the Prosecution Function and the Defense Function,* sec. 3.11(c) at 100, 102 (Approved Draft, 1971)). Then, recognizing the difficulty of achieving this IDEAL, the court drew back, formulating a due diligence test for the prosecutor: that is, "whether by the exercise of due diligence" the prosecutor should have discovered the materials or information at issue. *Wold,* 57 Wis. 2d at 350.

¶ 73. "Due diligence" is defined as the "diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation.—Also termed reasonable diligence." *Black's Law Dictionary* 468 (7th ed. 1999).

¶ 74. Several Wisconsin decisions have applied the due diligence test to fact situations under the statute. In *Jones v. State,* 69 Wis. 2d 337, 230 N.W.2d 677 (1975), the defendant claimed a violation of the statute because the prosecutor failed to produce the arrest record of a key witness until the fourth day of trial. The court repeated the due diligence test, then quoted from the ABA Standards:

> The prosecuting attorney's obligations under this section extend to material and information in the possession or control of members of his staff and of *any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office.*

*Id.* at 349 (emphasis added) (quoting American Bar Association Project on Standards for Criminal Justice,

*Standards Relating to Discovery and Procedure Before Trial,* sec. 2.1(d) at 14 (Approved Draft, 1970)).

¶ 75. The *Jones* court seized upon the phrase "participated in the investigation or evaluation" of the case to exclude two law enforcement agencies—the FBI and the Los Angeles Police Department—from the scope of the prosecutor's search, because these agencies had not participated in the investigation or evaluation of the case. "Therefore," the court said, "the prosecutor had no duty of his own accord, in response to a general discovery motion, to seek [a prosecution witness's] arrest record from these sources." *Jones,* 69 Wis. 2d at 349. The court added that "[t]o impose such a duty would create significant practical difficulties since to exercise 'due diligence' the prosecutor arguably could thus be required to routinely check for possible conviction records in all 50 states." *Id.* Under the *Jones* formulation, the prosecutor is not required to obtain information that is not discoverable by due diligence from the agencies investigating or evaluating the case, *unless* the defendant has designated the information and pointed to its source. *Id.* at 349–50.

¶ 76. Today, the advent of the computer may have rendered the *Jones* analysis outdated with respect to criminal records. Today, a prosecutor may not reasonably argue that there is no obligation to search for the criminal records of the defendant and prosecution witnesses beyond the specific law enforcement agencies investigating or evaluating the case. Due diligence requires more. Criminal records constitute finite designated evidence that can often be obtained through a computer search. The prosecutor is expected to make a thorough effort, using the ordinary channels, to obtain this information.

¶ 77. The *Jones* case is still valid, however, in limiting the scope of the search for information less specific and finite than criminal records. The prosecutor must examine the files and records of the agencies investigating or evaluating the case to find the information listed in Wis. Stat. § 971.23(1). But the prosecutor has no obligation to locate information that is not discoverable by due diligence—primarily from these agencies—particularly if the defendant has not designated the whereabouts of specific information. An open-ended search for information beyond the investigative agency is not reasonable because of "significant practical difficulties."

¶ 78. The analysis in *State v. Martinez*, 166 Wis. 2d 250, 479 N.W.2d 224 (Ct. App. 1991), helps to explain the term "investigative agency." The court said: "For purposes of the criminal discovery statutes, we view an investigative police agency which holds relevant evidence as an arm of the prosecution. In most criminal cases, the evidence against the accused is garnered, stored and controlled by the investigating police agency."[2] *Id.* at 260.

¶ 79. Like *Jones, Martinez* linked due diligence to the agency investigating the crime. This principle underlaid the decision in *State v. Maass*, 178 Wis. 2d 63, 502 N.W.2d 913 (Ct. App. 1993). In *Maass*, the Jefferson County Sheriff's Department was the investigative agency in a homicide that occurred in that county. Two days before trial, a part-time Town of Ixonia police

---

[2] The court noted that the police are frequently entrusted with "the custody and control" of material "even after it has been elevated to formal evidentiary status in a criminal proceeding." *State v. Martinez*, 166 Wis. 2d 250, 260, 479 N.W.2d 224 (Ct. App. 1991).

officer advised the district attorney of an inculpatory statement that the defendant had made two months *before* the homicide. *Id.* at 65–66. The district attorney immediately informed defense counsel. *Id.* at 66. Maass claimed that the part-time officer's failure to disclose the statement earlier should be imputed to the district attorney because the district attorney's duty to disclose information "extend[ed] to material and information possessed by the district attorney's staff or others who have participated in the investigation or evaluation of the case." *Id.* at 69. The state replied that the district attorney's duty to discover evidence did not extend to information possessed by the part-time officer because the officer was not involved in the investigation or evaluation of the case *and* did not regularly report to the district attorney or report to the district attorney in that case. The court of appeals said:

> We conclude that the discovery statute does not impose on the district attorney the undifferentiated duty to consult every law enforcement officer who conceivably could have information respecting a case under investigation by the district attorney and the district attorney's investigating agency, which in this case was the Jefferson County Sheriff's Department.

*Id.* at 71.

¶ 80. The majority opinion misapplies the broad principles of *Wold, Jones, Martinez,* and *Maass* because it blurs the distinction between agencies that investigate or evaluate "the case" and agencies that do not, thereby unreasonably enlarging the scope of the prosecutor's obligation to search for information. The opinion implies that due diligence requires a prosecutor to go beyond the agencies that investigate or evaluate "the case" to find materials and information that have not been designated by their nature and source. Put in

specific terms, the opinion implies that the prosecutor here had a duty to seek out potential evidence in the possession of the Racine Police Department, even though the crimes involved in "the case" against Media DeLao did not occur in Racine and even though the Racine police never "investigated" her case. This expansion of due diligence will create an unreasonable burden for prosecutors in the future.

¶ 81. To justify this result, the majority opinion summarizes the court of appeals decision as concluding that "the investigation of the robbery [in Racine] and the investigation of the shooting [in the Town of Mount Pleasant] were 'hopelessly intertwined' with respect to DeLao."[3] Majority op. at ¶ 35.

¶ 82. The record does not support this *factual* finding by the court of appeals.[4] The record shows that on May 31, 1999, a grocery store was robbed in the City of Racine. The robbery was investigated by the Racine Police Department, whose lead investigator was Detective James Prioletta. On June 7, 1999, a shooting occurred in the Town of Mount Pleasant. Media DeLao heard shots and, thereafter, she allegedly engaged in certain crimes in Mount Pleasant to obstruct the inves-

---

[3] The majority opinion attempts to bolster this factual finding with the observation that, "[t]he two investigations overlapped substantially both in time and in the cast of characters involved." Majority op. at ¶ 35.

[4] In the same paragraph in which it made the "hopelessly intertwined" finding, the court of appeals stated that, "DeLao was not a mere citizen witness. She was a suspect." *State v. DeLao*, 2001 WI App 132, ¶ 135, 246 Wis. 2d 304, 629 N.W.2d 825. There is no evidence that DeLao was ever a suspect in the robbery, and she certainly was not "a suspect" in the June 7 crimes after she had been charged with these crimes 20 days earlier and had already received a preliminary examination.

327

tigation. The shooting and DeLao's alleged crimes were investigated by Investigator Doug Chaussee of the Mount Pleasant Police Department. There is no evidence that Prioletta ever "investigated" the Mount Pleasant shooting or DeLao's alleged crimes, and no evidence that Chaussee ever "investigated" the Racine robbery. There is no evidence that anyone in the majority's "cast of characters" has ever been charged in the Racine robbery. There is no reference to the Racine robbery in the DeLao criminal complaint, in the transcripts of DeLao's preliminary examination, or the transcripts of any other proceeding *before* DeLao's trial. Circuit Judge Dennis Flynn described the Racine robbery as "a crime separate from what is alleged against the defendant here [in DeLao's case]."

¶ 83. In short, while the time frame of the investigations overlapped and the "cast of characters" overlapped, the "investigations" of the separate crimes did not. Chaussee did tell Prioletta that DeLao might have information about the robbery, and he did make the guns seized at DeLao's home available to the Racine Police Department for testing. But the two cases were distinct and separate, and it is an enormous stretch to declare that the two investigations were "hopelessly intertwined." If Desmond Stalsberg, DeLao's boyfriend, had been charged with the Racine robbery *and* if Prioletta had submitted his interview with DeLao concerning Stalsberg to the district attorney to support a Stalsberg robbery charge, the situation would be different. But neither of those things happened.

¶ 84. The majority opinion asserts that Investigator Chaussee "dispatched" Detective Prioletta to interview DeLao *after* she had been charged with the Mount Pleasant crimes. Majority op. at ¶ 44. Use of the verb "dispatched" insinuates that Prioletta was a stalking

horse for Chaussee. This hint of improper police conduct[5] is contrary to the record. The majority elsewhere admits that the focus of Prioletta's inquiry was the robbery, not DeLao's alleged crimes. Majority op. at ¶ 6. The most telling evidence that Prioletta was not Chaussee's agent is that Prioletta did not tell Chaussee about his interview with DeLao until 27 days after it had occurred.

¶ 85. The majority opinion also sidesteps the second prong of the two-prong test for determining a prosecutor's duty to secure information. As quoted above, the ABA Standards direct the prosecutor to seek out information from "others," including law enforcement agencies, "who have participated in the investigation or evaluation of the case *and* who either regularly report or with reference to the particular case have reported to his office." American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Discovery and Procedure Before Trial,* sec. 2.1(d) at 14 (Approved Draft, 1970).

¶ 86. Here the majority concentrates on the alleged "investigation" prong and whisks past the "reporting" prong. The Racine Police Department did not regularly report to the prosecutor and did not report with reference to the DeLao case until the middle of trial. Majority op. at ¶ 24.

¶ 87. To sum up, the answer to the first question under Wis. Stat. § 971.23(1) is that the prosecutor was

---

[5] In *State v. Dagnall,* 2000 WI 82, ¶ 53, 236 Wis. 2d 339, 612 N.W.2d 680, this court discussed a defendant's Sixth Amendment right to counsel after being charged with an offense: "After an attorney represents the defendant on particular charges, the accused may not be questioned about the crimes charged in the absence of an attorney." DeLao was represented by counsel long before the Prioletta interview.

not required by due diligence to seek out information from the Racine Police Department because neither Prioletta nor his agency ever investigated or evaluated the DeLao case. Moreover, the Racine Police Department did not report regularly to the district attorney and did not file a report about the DeLao case with the district attorney until July 28, 1999, the second day of trial. Any implication that the prosecutor here should have sought information from the Racine Police Department will alter the standard for due diligence, forcing prosecutors to search for cumulative materials and information that is neither exculpatory nor necessary to prosecute a case.

## III. PROSECUTOR'S OBLIGATION TO DISCLOSE INFORMATION

¶ 88. The second issue in applying Wis. Stat. § 971.23(1) is the extent of the prosecutor's duty to disclose materials and information if the materials and information are in the possession, custody or control of the state. The majority opinion concludes that the prosecutor breached her duty to disclose when she failed to turn over the DeLao interview as soon as Chaussee learned of it. This conclusion, and the interpretation of the statute that is required to reach it, should be rejected.

A. Reasonable Duty To Disclose

¶ 89. The majority opinion interprets the introductory sentence of Wis. Stat. § 971.23(1) as creating an absolute duty to disclose certain "materials and information, if it is within the possession, custody or control of the state." An absolute duty to disclose disregards any circumstance in which the prosecutor and the

prosecutor's agents do not realize that they have the materials or information, or do not realize the significance of the materials and information they have.[6] An absolute duty will lead occasionally and inevitably to unintentional breaches of the prosecutor's discovery obligation.

¶ 90. The law ought to take into account the reasonableness of a duty to disclose information just as it takes into account the reasonableness of a duty to find information. The statute must either create a reasonable duty to disclose on the front end or tolerate a reasonable breach of that duty on the back end. A prosecutor's unintentional breach of an absolute duty to disclose should not be treated the same as a prosecutor's deliberate withholding of requested information.

¶ 91. The prosecutor's duty to disclose can. be made reasonable when the defendant designates the information sought and indicates in which it can be obtained. This is alluded to in *Jones,* where the court quotes commentary on the ABA Standards Relating to Discovery to explain why a defendant is sometimes required to designate information "[w]here the existence of . . . information is known to the prosecutor but

---

[6] To give an example, an investigative agency may possess criminal or juvenile records concerning a prosecution witness but not realize it because the information is recorded under a different name. The law can react to such facts in various ways. It can create an absolute duty to disclose and impose a sanction upon the prosecutor for failure to do so. This may reward a defendant for a prosecutor's inadvertent error. It can create an absolute duty to disclose but excuse the failure to disclose if the prosecutor is able to show good cause. Wisconsin Stat. § 971.23(1)(f) addresses this specific example by creating a duty to disclose the criminal record of a prosecution witness "*which is known to the district attorney.*" Wis. Stat. § 971.23(1)(f) (emphasis added).

its quality as matter which he is obligated to disclose is not apparent to him." *Jones,* 69 Wis. 2d at 350 (quoting American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Discovery and Procedure Before Trial,* sec. 2.4 at 83–84 (Approved Draft, 1970)).

¶ 92. The facts here show that an absolute duty to disclose information is not reasonable. DeLao's attorney drafted a discovery demand on June 16, 1999, and filed it with the district attorney on June 30, 1999. The discovery demand arrived two days after the Prioletta-DeLao interview. It asked the prosecutor to furnish "a written summary of any oral, written or recorded statements of the defendant, but not limited to those statements which the state intends to use in the course of the trial." Although this discovery demand was broad enough to encompass the DeLao interview at the point when the substance of that interview was in the possession, custody or control of the state, it went well beyond the obligations of Wis. Stat. § 971.23(1)(a) and (b), did not designate the June 28 interview, and could not have contemplated that interview because it was drafted 12 days before the interview took place.[7]

¶ 93. Although it is not clear when the prosecutor answered DeLao's discovery demand, it is likely that the prosecutor answered the demand "within a reasonable time before trial," as required by Wis. Stat. § 971.23(1).

---

[7] There is clear evidence that DeLao's attorney submitted a boilerplate discovery demand, not a document designed to alert the prosecutor to the existence of some important oral statement by the defendant. The demand document invokes the authority of "Sections 971.23, 971.24, and 971.25 of the Wisconsin Statutes." Wisconsin Stat. §§ 971.24 and 971.25 were repealed effective January 1, 1997, two and one-half years before the discovery document was filed. 1995 Wis. Act 387, §§ 26, 29.

This would have been before Sunday, July 25, the date Chaussee first learned about the DeLao interview. Consequently, if the new information about the interview had to be disclosed, it would have had to be disclosed under subsection (7):

> If, subsequent to compliance with a requirement of this section, and prior to or during trial, a party discovers additional material or the names of additional witnesses requested which are subject to discovery, inspection or production under this section, the party shall promptly notify the other party of the existence of the additional material or names.

Wis. Stat. § 971.23(7).

¶ 94. The prosecutor disclosed the interview information to the defense as soon as she learned about it. For his part, Chaussee advised the prosecutor about the information as soon as he could after he realized its relevance.[8] Chaussee said he realized its relevance at about 12:30 a.m. on July 28, 1999. He said his epiphany occurred at home, shortly after midnight, as he was thinking about the case. This was after he heard the defendant's opening statement and had a chance to ruminate about it.

¶ 95. The circuit court accepted Chaussee's version of events. The court understood that Chaussee did not have a written report of the DeLao interview until the noon hour on July 28. Prioletta had to be asked to write up that report during the trial. The court also recognized that Prioletta never talked to DeLao about the events of June 7. Prioletta discussed conversations

---

[8] Chaussee commenced his testimony on July 27. He realized the relevance of DeLao's interview after his first day on the stand but was not permitted to speak to the prosecutor until he completed his testimony on July 28.

333

that DeLao overheard before June 7. In the interview, DeLao never told Prioletta that she was afraid of Desmond Stalsberg.[9] Rather, she discussed her relationship with Stalsberg and his friends. Thus, it was largely DeLao's description of her relationship with Stalsberg and her silence about her alleged fear of him that were used to rebut her defense.

¶ 96. As a result, the significance of the DeLao interview for trial was not immediately apparent to Chaussee.[10] Information from the interview was not relevant in proving the charges against DeLao. It was helpful only in rebutting DeLao's defense which she did

---

[9] At trial, in rebuttal, the prosecutor questioned Detective Prioletta:

> PROSECUTOR: Did [DeLao] ever express to you that she was afraid of Desmond Stalsberg?
>
> PRIOLETTA: No.

Then, in cross-examination of Prioletta, the following exchange occurred:

> DEFENSE ATTORNEY: And you didn't ask [DeLao] whether or not she was afraid of Desmond Stalsberg, did you?
>
> PRIOLETTA: No, I did not ask her that.
>
> DEFENSE ATTORNEY: Because you really weren't there about her situation; you just wanted to know information about any robberies that Desmond Stalsberg or John Sabala might have been in?
>
> PRIOLETTA: Not any. I was there for a specific reason, the robbery I was investigating.

[10] The significance of the DeLao interview was not immediately apparent to Prioletta either. The majority fails to explain why Prioletta waited 27 days after the interview to tell Chaussee about it if he understood that the interview was relevant to DeLao's trial.

not make clear until trial. Moreover, Investigator Chaussee did not know before trial that DeLao would testify.

¶ 97. The prosecutor disclosed information about the DeLao interview as soon as its relevance was recognized. The majority holds that this was not good enough. It quotes *Martinez,* 166 Wis. 2d at 260, to the effect that, "an investigative police agency which holds relevant evidence [is] an arm of the prosecution." Majority op. at ¶ 23. Thus, the majority says, the prosecutor was charged with knowledge of information in the possession of the investigating police agency (Mount Pleasant), on and after July 25, and she violated the discovery statute by failing to disclose that information to the defense before trial.

¶ 98. This conclusion does not square with a reasonable duty—with the reasonable diligence expected from a prosecutor or an investigator working with a prosecutor. Imposing an absolute duty to disclose information will not withstand close scrutiny over time.

## B. Duty to Disclose Promptly

¶ 99. Even an interpretation of the statute requiring an absolute duty to disclose certain "information within the possession, custody or control of the state" does not settle the issue. For instance, where the prosecutor has made disclosure to the defendant, as here, the court may have to decide whether the disclosure was timely.

¶ 100. This case is governed by Wis. Stat. § 971.23(7), which provides that, upon discovery of additional materials, the prosecutor has a duty to "*promptly* notify the other party of the existence of the additional material" (emphasis added).

335

¶ 101. In this case, Chaussee was told about the DeLao interview on Sunday, July 25, 1999, and the prosecutor notified the defendant three days later, within minutes of learning about it herself.

¶ 102. The majority concludes that promptness required the prosecutor to make disclosure of Chaussee's new information *before* trial, probably on Monday, July 26, the only work day before trial. Because the circuit court determined that the state made timely disclosure, the majority must reach its opposite conclusion as a matter of law. In deciding this issue, the majority gives short shrift to the fact that Chaussee did not have any written report from Prioletta and did not immediately see how Prioletta's oral summary of the DeLao interview related to the trial.[11] It also ignores the circuit court's finding that the DeLao interview was not relevant to the charges in her case; the interview was relevant only to her impeachment. By insisting that the interview information had to be disclosed to the defendant *before trial,* the majority opinion treats the timing of the prosecutor's disclosure the same as if the prosecutor had made no disclosure at all.

## C. Information Subject to the Duty to Disclose

¶ 103. A court must determine whether materials and information in the possession, custody or control of the state are subject to a duty to disclose under Wis. Stat. § 971.23(1), because not all information must be disclosed. To illustrate, paragraph (a) requires the prosecutor to disclose *any* "written or recorded statement *concerning the alleged crime* made by the defen-

---

[11] As a practical matter, the majority is saying that Chaussee should have asked Prioletta to prepare a written report as soon as he heard about the interview.

dant." Wis. Stat. § 971.23(1)(a) (emphasis added). These words convey a relatively clear directive to the prosecutor. By its terms, paragraph (a) does not obligate the prosecutor to turn over a "written or recorded statement" made by the defendant that does not relate to the alleged crime.

¶ 104. By contrast, paragraph (b) requires the prosecutor to disclose a "written summary of *all* oral statements of the defendant." Wis. Stat. § 971.23(1)(b) (emphasis added). If there were no additional language in the statute, paragraph (b) would seem to impose an unlimited duty upon the prosecutor to disclose the defendant's oral statements. There would be no limit of relevance.[12] Courts would be forced to ask such questions as: Does paragraph (b) require the prosecutor to disclose a defendant's oral statements about her victimization in an unrelated burglary or her involvement in an unrelated automobile accident? Does paragraph (b)

---

[12] The ABA Standards on Discovery recognize the problem of scope. Standard 11.2.1 (Prosecutorial disclosure), in paragraph (a)(i), requires the pretrial disclosure of "[a]ll written and all oral statements of the defendant or of any codefendant that are within the possession of the prosecution *and that relate to the subject matter of the offense charged,* and any documents relating to the acquisition of such documents." American Bar Association *Standards for Criminal Justice,* 11–2.1, at 1 (3d ed. 1996) (emphasis added).

The court of appeals dismissed this concern when it wrote: "Chaussee knew of DeLao's statements prior to trial, yet failed to inform the district attorney because he did not think the statements were relevant. It is not Chaussee's job to determine the relevancy of evidence." *DeLao,* 2001 WI App 132, ¶ 27. This comment fails to recognize that police officers routinely determine what they consider important enough to include in their own police reports.

require the prosecutor to disclose a defendant's oral statements to an undercover law enforcement officer if the statements are not intended for use at trial? If we were to give an affirmative answer to these questions, we would be requiring the release of the "names of witnesses to the defendant's oral statements." Wis. Stat. § 971.23(1)(b). In the first example, disclosing the names of the witnesses would be absurd; in the second example, disclosing the name of the undercover officer might impair ongoing undercover investigations.[13]

¶ 105. We do not have to wrestle with these problems because there *are* additional words in the statute, namely, the phrase "which the district attorney plans to use in the course of the trial." These words place a realistic limitation on the prosecutor's duty to disclose the defendant's oral statements.

¶ 106. Significantly, there are two clear tracks within subsection (1) of Wis. Stat. § 971.23. Paragraphs (a), (c), (f) and (h) and parts of paragraph (e) appear, at least superficially, to create an unconditional obligation upon the prosecutor to disclose certain materials and information "if it is within the possession, custody or control of the state."[14] They make no reference to the prosecutor's intent. The unconditional obligation applies to: (1) any written or recorded statement concerning the alleged crime made by the defendant; (2) a copy of the defendant's criminal record; (3) any relevant written or recorded statement of a witness whom the district attorney intends to call at trial; (4) any reports

---

[13] A protective order under Wis. Stat. § 971.23(6) will frequently *not* solve this problem.

[14] Wisconsin Stat. § 971.23(1)(f) imposes an unconditional obligation to disclose the "criminal record of a prosecution witness *which is known to the district attorney*" (emphasis added). Paragraph (f) poses special problems of interpretation.

or statements of experts made in connection with the case, or any written summary of the expert's findings or the subject of the expert's testimony; (5) the criminal record of any prosecution witness which is known to the district attorney; and (6) any exculpatory evidence.

¶ 107. Paragraphs (b), (bm), (d), (g) and parts of paragraph (e) of Wis. Stat. § 971.23(1) are different. They explicitly *limit* the prosecutor's obligation to turn over enumerated materials and information. In each of these paragraphs, the prosecutor's duty to disclose information is conditioned upon the prosecutor's *intent* to use the information as evidence. Paragraph (b) limits the disclosure of oral statements of the defendant to those statements "which the district attorney plans to use in the course of the trial." Paragraph (bm) limits disclosure of wiretap evidence unless "the district attorney intends to use the evidence at trial."[15] Paragraph (d) limits the required list of witnesses to witnesses "whom the district attorney intends to call at the trial." Paragraph (e) limits disclosure of the results of physical or mental examinations, scientific tests, experiments or comparisons to those that "the district attorney intends to offer in evidence at trial." Paragraph (g) limits the disclosure of physical evidence to evidence "that the district attorney intends to offer in evidence at the trial."

¶ 108. The majority opinion overlooks the prosecutorial discretion built into the statute when it rejects the state's interpretation of the phrase "plans to use." The majority writes:

---

[15] Without the limitation of the prosecutor's intent, paragraph (bm) would require the prosecutor to release wiretap transcripts of an investigation target to a defendant whose conversation happens to be recorded as part of the wiretap.

The State maintains that the phrase "plans to use" embodies a subjective component. According to the State, the prosecutor in DeLao's case could not have planned to use DeLao's statements before DeLao's trial began because a prosecutor cannot plan to use what the prosecutor does not actually know. DeLao asserts . . . that the phrase "plans to use" . . . embodies an objective standard. We agree with DeLao that the standard is necessarily objective.

Majority op. at ¶ 25. In concluding that the phrase "plans to use" embodies an objective standard, the majority is simply rewriting the statute.[16]

---

[16] In *State v. Ruiz,* 113 Wis. 2d 273, 335 N.W.2d 892 (Ct. App. 1983), *rev'd,* 118 Wis. 2d 177, 347 N.W.2d 352 (1984), the court of appeals considered a situation in which a prosecutor knew of an inculpatory statement the defendant made to several witnesses about the crime. The prosecutor did not disclose the statement to the defendant. At trial the prosecutor asked a witness questions that elicited the statement. The state later argued that the prosecutor did not plan to use the statement at trial because the prosecutor did not know how the witness would answer the questions. The court responded: "To say that the prosecutor need disclose only what he is abundantly certain the witness will repeat would make a mockery of the discovery provisions." *Id.* at 278 n.3. The court of appeals decision was ultimately reversed on grounds that admission of the inculpatory statement was harmless error. *See infra* ¶ 77.

In any event, the court of appeals decision in *Ruiz* can be distinguished from the present case. In *Ruiz,* the prosecutor hoped to elicit the inculpatory statement, even if he did not know whether he would succeed. The case differs in at least four respects from the present case: (1) The prosecutor in *Ruiz* personally knew about the defendant's statement; (2) The statement related to the crime charged; (3) The prosecutor asked questions of a witness in the case-in-chief to elicit the

¶ 109. In addition, the majority's opinion departs from precedent. In *State v. Larsen,* 141 Wis. 2d 412, 415 N.W.2d 535 (Ct. App. 1987), the court noted that the state had possessed for some time prior to trial a written statement from the defendant's cellmate recounting "numerous statements [the defendant had] made about concocting an alibi defense" to the charges against him. The state did not give the defendant a copy of the statement until a week before trial. *Id.* at 425. The majority opinion views the state's disclosure in *Larsen* as a timely pretrial disclosure, but it fails to fully acknowledge the *Larsen* court's analysis:

> The state did not give Larsen a copy of this statement until a week before trial. The district attorney explained that he did not intend to use the cellmate's statement until Larsen filed his notice of alibi. We conclude that sec. 971.23(1) Stats., did not require the district attorney to permit Larsen to inspect and copy or photograph the written statement of Larsen's cellmate which was in his possession or provide him with a written summary of Larsen's oral statements made to his cellmate prior to the time the district attorney concluded he would introduce Larsen's statements at the time of trial. There is no suggestion that the state always intended to use the cellmate's statement but, as a stratagem, waited until the last minute to notify Larsen of the existence of the statement and its intent to use it.

*Id.*

¶ 110. The *Larsen* analysis cannot be dismissed by hair-splitting distinctions. A reasonable prosecutor, including a Racine County prosecutor, could have relied upon *Larsen* as validating a prosecutor's good faith

statement; and (4) According to the court of appeals, the prosecutor had a history of non-disclosure.

subjective intent to use evidence as a prerequisite for the prosecutor's required disclosure of some information. The analysis in the majority opinion is directly contrary to the analysis in *Larsen* and in another case, *State v. Moriarty,* 107 Wis. 2d 622, 321 N.W.2d 324 (Ct. App. 1982).[17]

¶ 111. More important, the majority opinion completely fails to explain the parallel language of subsection (1): "intends to use," "intends to call," and "intends to offer." It is wholly unclear how the phrase "plans to use" could embody an objective standard if the other intent phrases in the subsection still embody a subjective standard. There ought to be consistency within the context of a subsection.

¶ 112. The inevitable implication of the majority opinion is that all paragraphs in the subsection embody an objective standard.[18] This opens the door to the mandatory disclosure of materials under paragraphs

---

[17] In *State v. Moriarty,* 107 Wis. 2d 622, 321 N.W.2d 324 (Ct. App. 1982), the defendant argued that the circuit court committed error when it admitted into evidence certain medical conclusions offered by the state on rebuttal even though the state had not produced the medical records in response to the defendant's discovery demand. The court held that "the conclusions were properly admitted *because the State did not intend to use the records at trial* and offered the evidence only in rebuttal." *Id.* at 623 (emphasis added). The court noted specifically: "The district attorney in the present case stated that he did not intend to use the medical records in the presentation of his case-in-chief." *Id.* at 627.

[18] In light of the majority opinion, an argument can be made that paragraph (f) concerning criminal records of prosecution witnesses also should be subject to an objective standard. That is, the district attorney should disclose not only the "criminal record of a prosecution witness which is known to the

(b), (bm), (d), (e), and (g) in circumstances in which the material is never used and was never intended to be used as evidence.

¶ 113. To my mind, paragraphs (b), (bm), (d), (e), and (g) of subsection (1) contemplate a prosecutor's subjective intent. This subjective intent must not be tainted by bad faith. Circuit courts have the power to address a prosecutor's bad faith or manifest incompetence by excluding evidence or devising other remedies to protect the defendant. Wis. Stat. § 971.23(7m). But when a prosecutor seeks to use information that has not been timely disclosed because the prosecutor clearly did not intend to use it, the prosecutor should be permitted to explain and try to justify the shift in position, especially if the shift is responsive to some action or strategy of the defendant.

¶ 114. Most important, the majority opinion is impractical. It insists that a prosecutor turn over not only what the prosecutor knows and plans to use but also what a reasonable prosecutor *should* have known and *would* have planned to use if the reasonable prosecutor had known it existed. And it demands that these disclosures be made *before* trial. This soars beyond previous decisions and is too utopian to make sense in a busy prosecutor's office. It is a blueprint for second-guessing and attacking a prosecutor's conduct.

D. Exception to Duty to Disclose for Rebuttal and Impeachment Witnesses

¶ 115. A prosecutor may not have to disclose some information to the defendant *even when the prosecutor*

district attorney" but also the criminal record of a prosecution witness which *should be known* to a reasonable district attorney.

*intends to use it at trial.* Wisconsin Stat. § 971.23(1)(d) requires the prosecutor to disclose "[a] list of all witnesses and their addresses whom the district attorney intends to call at the trial." This list of witnesses is linked to paragraph (e), which requires the prosecutor to disclose "[a]ny relevant written or recorded statements of a witness named on a list under par. (d)." Wis. Stat. § 971.23(1)(e).

¶ 116. What is vital to remember is that paragraph (d) also provides: "*This paragraph does not apply to rebuttal witnesses or those called for impeachment only*" (emphasis added). The existence of this exception in paragraph (d) legitimizes the use of rebuttal witnesses who may surprise the defendant.[19] This was shown in *Lunde v. State,* 85 Wis. 2d 80, 270 N.W.2d 180 (1978). Lunde was charged with delivering a controlled substance to a special agent of the Drug Enforcement Administration (DEA). The agent was introduced to Lunde by James Anderson, an undercover informer. At trial, Lunde took the stand and denied the charges in their entirety. He denied that he had ever seen the DEA agent, denied knowing Anderson, and denied knowing anything about the "angel dust" he had sold to the agent. The court described the situation:

> Over objection, James Anderson, the informer, was called as a rebuttal witness. Defense counsel's objection was based on the fact that the state had previously notified the defense that it would call three witnesses but had not mentioned Anderson as a possible witness.

---

[19] "Surprise is not listed as a specific ground for exclusion of evidence. This court has recognized that a continuance will generally be a more appropriate remedy for surprise than exclusion." *State v. O'Connor,* 77 Wis. 2d 261, 287–88, 252 N.W.2d 671 (1977) (citing *Frederickson v. Louisville Ladder Co.,* 52 Wis. 2d 776, 784, 191 N.W.2d 193 (1971)).

> *The prosecutor stated that he had not intended to call Anderson, he did not know where Anderson was until after the trial commenced, and it was only after the defendant elected to take the stand and denied knowing Anderson that the decision was reached to call Anderson in rebuttal.*

*Id.* at 84–85 (emphasis added).[20] The court concluded that the state had no duty to provide the names of bona fide rebuttal witnesses regardless of any demand of the defendant. *Id.* at 91 (citing *Hough v. State,* 70 Wis. 2d 807, 816, 235 N.W.2d 534 (1975), and *Caccitolo v. State,* 69 Wis. 2d 102, 115, 230 N.W.2d 139 (1975)). The court noted that Anderson's testimony was only necessary and appropriate when the defendant took the stand and denied that he knew Anderson and attempted to create a doubt as to his own whereabouts. *Id.* at 92.

¶ 117. The rebuttal/impeachment exception has implications for this case. Prioletta was not listed as a prosecution witness. The district attorney did not intend to call him at trial. Consequently, his statement, *even if it had been written or recorded,* which it was not, need not have been disclosed under paragraph (e). It would have had to be disclosed only if disclosure were required under some other paragraph.

¶ 118. The majority's opinion has an unexpected and unfortunate consequence with regard to witnesses called in rebuttal. Rebuttal witnesses serve the purpose of keeping a person's testimony honest. This includes the defendant in a criminal case who takes the witness stand voluntarily. Under the majority opinion, however, some rebuttal or impeachment evidence against a de-

---

[20] In *Lunde,* this court did not repudiate the state's argument that the prosecutor had not *intended* to call Anderson as a witness. *Lunde v. State,* 85 Wis. 2d 80, 270 N.W.2d 180 (1978).

fendant will be suppressed; and, in that situation, the defendant may be able to testify without fear of contradiction *and* with virtual immunity from prosecution for perjury. *See State v. Canon,* 2001 WI 11, 241 Wis. 2d 164, 622 N.W.2d 270.[21]

## IV. GOOD CAUSE FOR VIOLATION

¶ 119. Wisconsin Stat. § 971.23 does not automatically exclude witnesses or evidence in the wake of a prosecutor's failure to comply with a discovery demand. The prosecutor may show the court "good cause . . . for failure to comply." Wis. Stat. § 971.23(7m)(a). The statute also explores several alternatives to the exclusion of evidence.

¶ 120. The "good cause" provision constitutes additional proof that the legislature intended the statute be given a reasonable interpretation. If this court expands the scope of the prosecutor's obligation to search for materials and information and makes more absolute and "objective" the prosecutor's duty to disclose such information, it must balance these expanded duties against the prosecutor's good cause, or run the risk of creating a completely unworkable statute.

¶ 121. The majority opinion takes the view that the prosecutor did not have good cause for failing to disclose the Prioletta-DeLao interview before trial. The opinion asserts that DeLao's theory of defense was coercion. Majority op. at ¶ 10. It further asserts that

---

[21] In the present case, the testimony of Detective Prioletta, if suppressed, could not be used to support a subsequent perjury charge against DeLao because knowledge about the interview was not new and additional evidence discovered after trial. *See State v. Canon,* 2001 WI 11, ¶¶ 22–23, 241 Wis. 2d 164, 622 N.W.2d 270.

"the State's characterization of DeLao's theory of defense as materializing on the day her trial began is not supported by the facts." Majority op. at ¶ 37. In essence, the majority contends that as early as the night of the shooting, DeLao admitted to lying to the police, but explained that she was afraid and that Stalsberg was "acting crazy."

¶ 122. The defense of coercion is based upon Wis. Stat. § 939.46, which provides that:

> (1) a threat by a person ... which causes the actor reasonably to believe that ... her act is the only means of preventing imminent death or great bodily harm to the actor or another and which causes [her] so to act is a defense to a prosecution for any crime based on that act ....

The jury instruction related to Wis. Stat. § 939.46 explains that "[t]he law allows the defendant to act under the defense of coercion only if a threat by another person ... caused the defendant to believe that [her] act was the only means of preventing [imminent death or great bodily harm to herself or to others] and which pressure caused [her] to act as [she] did." Wis JI—Criminal 790. "[T]he defendant's beliefs must have been reasonable." *Id.* "In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed *at the time of the alleged offense.*" *Id.* (emphasis added).

¶ 123. Applying the coercion defense to the five crimes originally charged, DeLao would have to argue that she obstructed an officer (Chaussee); aided a felon (Stalsberg) by destroying, altering, hiding, or disguising physical evidence, with intent to prevent the apprehen-

347

sion and subsequent prosecution of Stalsberg; and possessed a short-barreled shotgun, a short-barreled rifle, and drug paraphernalia, *because* she reasonably believed these acts were the only means of preventing imminent death or great bodily harm to herself or another.[22]

¶ 124. The majority opinion contends that the record shows that DeLao's coercion defense was known to the State from the time of Chaussee's second interview with DeLao on the evening of June 7. Judge Flynn concluded otherwise, saying that "nothing has been presented to the court that indicates the parties were aware of any theory of defense in terms of the State being aware of it before opening statement was made."

¶ 125. In an effort to overcome this finding, the majority opinion attempts to show that Judge Flynn's determination was clearly erroneous. It turns to defense counsel's opening statement, partially quoted in ¶¶ 38–39 of the majority opinion, for its "evidence," and it attaches significance to the fact that the prosecutor did not interrupt the opening statement to object to counsel's argument.

¶ 126. In the opening statement, defense counsel argued that DeLao was afraid because Desmond Stalsberg was "acting crazy." This reference must be put in context. At trial, the defense attorney questioned DeLao about getting into Stalsberg's car after he had fled her house following the shooting and then come back:

> DEFENSE ATTORNEY: After you got in the car with Desmond, what happened then?

---

[22] The circuit court never authorized the jury to consider coercion as a potential defense for the weapons charges and the drug paraphernalia charge.

DELAO: We—he took off driving real fast, and I told him to slow down, where were we going, and he kind of said he didn't know, that we were just leaving and I was going with him, and I said where are we going, and he didn't really know. *He was just driving real crazy, and I told him to slow down because I thought we were gonna get in a car accident.* Then we drove past my mom's and I told him that I wanted to stay there, but he turned off, and then we ended up going down past Mitchell and towards Drexel, and then he would tell me that we're just going to go pick up the kids and that we were just going to leave, and I told him no, we weren't gonna go get my kids.

DEFENSE ATTORNEY: Why did you tell him you weren't going to get the kids?

DELAO: Because I didn't want my kids to be in the car with him or me at that time. *I felt like I was in danger* and I didn't want my kids to get hurt either.

DEFENSE ATTORNEY: Okay, and after you told him that you weren't going to go anywhere with him, what happened?

DELAO: He—we kind of argued about it and then he dropped me off behind my house by the mobile homes, and that was it, and then when I got there the police were already at my house (emphasis added).

¶ 127. This exchange was part of the defense case. Earlier, in the State's case-in-chief, Chaussee was asked to recount DeLao's comments about this same incident:

PROSECUTOR: Did she indicate whether she left with Desmond Stalsberg?

CHAUSSEE: Yes, she did.

PROSECUTOR: And did she indicate why?

CHAUSSEE: No, she said she got into the car with him and drove away from the scene. They argued a little bit in the car, and she subsequently got out of the

car; I believe she said near St. Lucy's Church on Drexel Avenue west of her residence.

PROSECUTOR: Did she indicate whether Desmond had ordered her to get in the car with him, or had forced her to get into the car with him, or was holding her at gunpoint or anything like that?

CHAUSSEE: No.

PROSECUTOR: Did she indicate whether she was afraid of him *at that point in time?*

CHAUSSEE: She did say in her statement that she was afraid, and I believe her quote was that Desmond was acting crazy (emphasis added).

¶ 128. Placing DeLao's quote in the proper context gives it a very different perspective. The defense strategy was to transform an isolated comment into a full-blown defense. The majority does not supply "evidence" that DeLao "explained" in her second interview with Chaussee why she lied to him in her first interview. Such an explanation purportedly serves as the notice of her defense theory.

¶ 129. DeLao's own testimony at trial severely undercuts her theory. She testified that she screamed at Stalsberg to stop shooting, refused to clean up the porch as he asked, refused to get her kids, refused to run away with Stalsberg, argued with him in his car, and prevailed on him to let her out. Yet, when she was in Chaussee's car a short time later, she lied to Chaussee and obstructed his investigation.

¶ 130. DeLao's testimony at trial supports Chaussee's testimony at the preliminary hearing that DeLao did *not* emphasize fear of Stalsberg:

DEFENSE ATTORNEY: And then she indicated to you that she had picked up some gun shells, is that correct?

350

CHAUSSEE: Shotgun shells, correct.

DEFENSE ATTORNEY: And that she—did she indicate to you that she was afraid at the point that she was picking up those shells?

CHAUSSEE: She said she was told to pick them up by Desmond.

DEFENSE ATTORNEY: And did she indicate that he had a gun at the time he was telling her to do it?

CHAUSSEE: He was in possession of a firearm, that's correct.

DEFENSE ATTORNEY: Did she indicate she was afraid at the time she was doing it?

CHAUSSEE: I don't recall her specifically saying that.

DEFENSE ATTORNEY: Did she indicate to you when you talked with her that basically all she wanted to do was to get Desmond out of her house?

CHAUSSEE: At what point?

DEFENSE ATTORNEY: At the point that you were talking to her the second time and she was telling you that she had picked up the gun shells—the shotgun shells, did she indicate to you the reason she had picked them up was to basically get Desmond out of her house?

CHAUSSEE: I don't believe it was ever put in that context, no.

¶ 131. There is no evidence that Stalsberg ever threatened DeLao. There is no evidence before trial that DeLao used her alleged fear of Stalsberg to explain picking up the shotgun shells or obstructing Chaussee.

¶ 132. The majority opinion also relies upon a comment by defense counsel at DeLao's initial appearance on June 9, 1999. Majority op. at ¶ 40. This

351

comment was part of counsel's argument on bail, not an announcement of the defense theory. Neither the district attorney who tried the case nor Chaussee was present at the hearing. Moreover, a transcript of the hearing was not prepared until five months after the trial. This offhand comment does not establish that the circuit judge who made his decision after reading the relevant documents and listening to the testimony was clearly erroneous.

¶ 133. In rejecting the argument that the prosecutor had good cause for not turning over information about the DeLao-Prioletta interview before trial, the majority makes certain assumptions: (1) Chaussee was an arm of the prosecution and any information he had must be imputed to the prosecutor; (2) by July 25, 1999, Chaussee had in his possession oral statements the defendant made to Prioletta, even though he did not have them in writing; (3) Chaussee knew or should have known the defense theory as of June 7, 1999; (4) Chaussee's failure to see the significance of the DeLao-Prioletta interview in relation to the defense theory is irrelevant, because any reasonable law enforcement officer would have understood that any reasonable prosecutor would plan to use the interview statements even though they would only be used for impeachment or rebuttal if the defendant testified; (5) no reasonable prosecutor who knew about the DeLao interview statements could have relied upon the language of Wis. Stat. § 971.23(1)(b) and the relevant paragraph in the *Larsen* case as a basis for concluding that a prosecutor's subjective intent made a difference in the duty to disclose; (6) no reasonable prosecutor could have relied upon the impeachment/rebuttal exception in paragraph (d) as a basis for withholding information; and (7) the

good faith of the prosecutor has little effect in determining whether the prosecutor has shown good cause.[23]

¶ 134. I disagree. In my view, the State has shown good cause. The facts and circumstances establish that the prosecutor had no intent to surprise or disadvantage the defendant by withholding information required to be disclosed. There is not even a whisper of prosecutorial bad faith. The prosecutor had no obligation to find the information at issue when it was in the possession of the Racine Police. She had no obligation to disclose the information at the moment it came into Chaussee's possession because it was not in writing and because neither the officer nor the prosecutor had any intent to use the information and did not see the value of the information until July 28. The prosecutor disclosed the information as soon as its relevance and its potential use were recognized, demonstrating her good faith; and she used the evidence only in impeachment and rebuttal, not in the case-in-chief.

## V. HARMLESS ERROR

¶ 135. The majority opinion determines that the circuit court should have excluded the Prioletta-DeLao interview from use at the trial both for impeachment on cross-examination and for rebuttal. "Absent a showing

---

[23] The decision in *State v. Martinez,* 166 Wis. 2d 250, 259, 479 N.W.2d 224 (Ct. App. 1991), makes clear that good faith does not necessarily equal good cause. On the other hand, "an assessment of the State's conduct in such terms [good faith] may be relevant to the question of 'good cause.'" *Id.* The prosecutor's good faith was an important factor in the court's finding of good cause in *State v. Wild,* 146 Wis. 2d 18, 429 N.W.2d 105 (Ct. App. 1988). It is very troubling that the majority opinion presents this case as though the State had no compelling facts to supplement its assertion of good faith.

of good cause, the evidence the State failed to disclose must be excluded. Wis. Stat. § 971.23(7m); *State v. Wild,* 146 Wis. 2d 18, 27, 429 N.W.2d 105 (Ct. App. 1988)." Majority op. at ¶ 51.[24]

¶ 136. In this case, the evidence was not excluded. It was used after Judge Flynn held a mid-trial hearing and offered to take a break for "as long as the parties want." DeLao was ultimately convicted of three offenses; she was acquitted of three others.

¶ 137. This court reviews a statutory discovery violation under a harmless error analysis. *State v. Koopmans,* 202 Wis. 2d 385, 396, 550 N.W.2d 715 (Ct. App. 1996) (citing *State v. Ruiz,* 118 Wis. 2d 177, 198, 347 N.W.2d 352 (1984)), *aff'd* 210 Wis. 2d 670, 563 N.W.2d 528 (1997).

¶ 138. In *Ruiz,* 118 Wis. 2d at 198, the court stated that the standard for determining whether a nonconstitutional error is harmless was set out in *State v. Gavigan,* 111 Wis. 2d 150, 163, 330 N.W.2d 571 (1983). *Gavigan* in turn had quoted *Wold,* 57 Wis. 2d at 356, as follows:

> The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the

---

[24] We cannot know how the prosecutor would have conducted her cross-examination of DeLao if all reference to the Prioletta-DeLao interview had been excluded. However, it is not unrealistic to speculate that she would have asked questions about DeLao's relationships with Stalsberg and members of the Latin Kings street gang because at least some of this information was known to the prosecutor and Chaussee independent of the Prioletta-DeLao interview.

inadmissible evidence, which would convict the defendant beyond a reasonable doubt.

*Gavigan,* 111 Wis. 2d at 163.

¶ 139. Several cases show the application of harmless error principles to discovery violations. In 1973 in *Wold,* 57 Wis. 2d 344, a case involving indecent liberties with a child, the court evaluated a situation in which the district attorney agreed to supply all crime laboratory reports to the defendant. These reports showed no incriminating evidence against the defendant. At trial, however, an analyst testified that she had found a seminal stain on Wold's underwear. The defense moved to strike the testimony on grounds that no reference to the stain appeared in the disclosed reports. In fact, the seminal stain had been found in a test taken *after* the district attorney had answered the discovery demand and of which he was unaware. The court stated:

> The question presented is whether evidence allegedly unknown to the state prior to trial and not disclosed to the defense pursuant to an agreement to disclose and an order of discovery should be excluded. We think the court should have excluded the testimony. In the presentation of the case, the district attorney should have discovered if later tests were made and if so, then, in keeping with his promise to disclose, the tests should have been given to the defendant.

*Id.* at 349.

¶ 140. Although the *Wold* court cited "the strong need to avoid surprise of the defense in the area of scientific evidence" and observed that "the prosecutor could have discovered the later test through a conference with his witnesses," *Id.* at 351, the court concluded

355

that admitting the testimony of the analyst about the stain was harmless error. *Id.* at 358.

¶ 141. The court said: "Without the consideration of the laboratory test showing stained underwear, [the] evidence would be sufficient in the minds of any jury to convict Wold beyond a reasonable doubt." *Id.* "The effect of any erroneously admitted statement, which carries no reversal as a matter of law, must be *realistically evaluated* in the context of the case." *Id.* at 357 (emphasis added).

¶ 142. Two years later, in *Kutchera v. State,* 69 Wis. 2d 534, 230 N.W.2d 750 (1975), the court reviewed a set of facts under Wis. Stat. § 971.23. The state did not disclose to the defendant three witnesses who were later called in the case-in-chief. The defendant's conviction was affirmed on the basis that defendant failed to establish surprise or prejudice. *Id.* at 543.

¶ 143. In 1984 in *Ruiz,* 118 Wis. 2d 177, in which the cases of two homicide defendants were consolidated, the district attorney failed to disclose to defendant Servantez his knowledge of a damaging statement Servantez made admitting that he had disposed of "the knife" that served as the murder weapon. The statement came into evidence through the questioning of a witness in the case-in-chief. This court said the statement fell within the discovery demand and that the prosecutor did not demonstrate good cause for his failure to disclose it. Nonetheless, the court unanimously upheld Servantez' conviction, saying:

> This court faced a situation similar to the present case in *Kutchera v. State* . . . . We reach a similar conclusion as to the undisclosed evidence in this case. [The witness's] testimony that Servantez said he had disposed of the knife merely added to an already strong

case. Our reading of the record persuades us that the exclusion of Servantez' statement would not have affected the result.

*Id.* at 199–200.

¶ 144. In 1996 in *Koopmans,* 202 Wis. 2d 385, the court of appeals reviewed a serious case of child abuse against the mother of the abused child. The dispute involved an inculpatory statement the defendant made to a police officer in the presence of a social worker. The state disclosed a report from the social worker in which the defendant was reported as saying that she would "hurt the child herself, which she did not, before she would think" her boyfriend would hurt the child. The officer, whose version of the incident was not disclosed, testified that the defendant had said: " 'I will just say I did this and we can just get this all behind us,' or something to that effect." *Id.* at 390–91. The court of appeals ruled that the defendant had received adequate notice through discovery. Alternatively, however, it concluded that non-disclosure of the officer's version of the statement was harmless error. *Id.* at 396.

¶ 145. In several of these cases, the state failed to disclose information that surprised and damaged the defendant. In *Wold, Kutchera, Ruiz,* and *Koopmans,* the state presented or elicited the evidence in the case-in-chief. By contrast, in this case, the state rested before there was any mention of the Prioletta-DeLao interview. The defendant was given a hearing on the new evidence and as much time as the parties wanted to make adjustments in the defense case. The defendant had the option not to testify.

¶ 146. These four cases were decided before the court restated its formulation of the harmless error test in a series of cases last term. *See Green v. Smith &*

357

*Nephew AHP, Inc.,* 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727; *Evelyn C.R. v. Tykila,* 2001 WI 110, 246 Wis. 2d 1, 629 N.W.2d 768; *Koffman v. Leichtfuss,* 2001 WI 111, 246 Wis. 2d 31, 630 N.W.2d 201; *Martindale v. Ripp,* 2001 WI 113, 246 Wis. 2d 67, 629 N.W.2d 698. In these cases, we concluded that for an error to affect the substantial rights of a party, there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue. A reasonable possibility of a different outcome is a possibility sufficient to undermine confidence in the outcome. *Green,* 2001 WI 109, ¶ 96; *Evelyn C.R.,* 2001 WI 110, ¶ 28; *Koffman,* 2001 WI 111, ¶ 51; *Martindale,* 2001 WI 113, ¶ 32.

¶ 147. This case is the first in which we apply our restated harmless error standard to a set of facts. Consequently, the case takes on added significance.

¶ 148. Considering all the facts of this case, is there a reasonable possibility that the Prioletta-DeLao interview contributed to the outcome of the trial in such a way that it undermines confidence in the outcome?

¶ 149. DeLao was convicted of three offenses: (1) obstructing an officer; (2) harboring/aiding a felon by acting with intent to prevent the apprehension of Desmond Stalsberg; and (3) possessing a short-barreled shotgun. She was found not guilty of: (1) harboring/aiding a felon by altering, destroying or hiding evidence; (2) possessing a short-barreled rifle; and (3) possessing drug paraphernalia.

¶ 150. The jury found DeLao guilty of two offenses related to her statements to Chaussee in his squad car, after she had returned home and Stalsberg had fled. There is no dispute that DeLao lied to Chaussee and misled him while she was talking to him in the

squad car. The only issue was whether she had a defense of coercion that justified her actions.

¶ 151. The jury did not accept DeLao's defense in circumstances when Stalsberg was not present. By contrast, it did accept her defense in relation to her conduct in picking up the shotgun shells and possibly cleaning up blood while Stalsberg was present with a gun in his hand.

¶ 152. The jury also convicted DeLao of possession of a short-barreled shotgun. This weapon was not tied to the June 7 shooting and did not come into her home on June 7. It was found in plain view on the bottom shelf of DeLao's linen closet. The circuit court did not authorize the jury to consider coercion as a defense for possession of this weapon.

¶ 153. All in all, the jury rejected minor charges and charges about which there was some factual dispute. The jury's obvious discernment inspires confidence in the outcome of the trial.

¶ 154. What is largely forgotten in the majority's determination that use of the interview information prejudiced the defendant is that DeLao knew that the authorities were aware of her relationship with Stalsberg. She also knew what she had said to Prioletta. If the import of her statements and her silence about fear was "objectively" obvious to Chaussee on July 25 when he received them second-hand, it must have been "subjectively" obvious to the defendant from the beginning. Why, then, did she not tell her attorney about the interview? Why did she take the stand to testify? Didn't she invite her own impeachment? Was she really surprised to be confronted with her own history?

¶ 155. The undercurrent of the majority's opinion is that Media DeLao was treated badly by the prosecutor and the circuit court. I disagree. The interview

359

evidence was not presented in the case-in-chief. The defendant was given a hearing on the new evidence during the trial and as much time as she needed to make adjustments to her defense. She always had the option not to testify, and any decision not to testify could not be made the subject of adverse comment.

¶ 156. This court must require reasonable diligence on the part of the government in meeting all its discovery obligations, but it should not expect clairvoyance or perfection. No decision by this court can deter good faith error.

¶ 157. This court has a responsibility to enforce a reasonable interpretation of the criminal discovery statute that recognizes the legitimate interests of both the defendant and the government. Because it has failed to do so, I respectfully dissent.

¶ 158. I am authorized to state that JUSTICE DIANE S. SYKES joins this dissenting opinion.